UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,
by BARBARA D. UNDERWOOD, Attorney General of the
State of New York,

                              Plaintiff,                   **FIRST AMENDED
                                                           COMPLAINT**

           -against-                                       Case No. 18-cv-9812 (AJN)

DEBT RESOLVE, INC.; HUTTON VENTURES, LLC;
PROGRESS ADVOCATES, LLC; PROGRESS ADVOCATES
GROUP, LLC; STUDENT ADVOCATES, LLC; STUDENT
ADVOCATES GROUP, LLC; STUDENT ADVOCATES
TEAM, LLC; STUDENT LOAN CARE, LLC; STUDENT
LOAN SUPPORT LLC; EQUITABLE ACCEPTANCE
CORPORATION; BRUCE BELLMARE; and STANLEY E.
FREIMUTH,

                              Defendants.
------------------------------------------------------------------ X

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................1

PARTIES ........................................................................................................................4

    I.   Corporate Defendants ....................................................................................5

        A.  The Owner Defendants ........................................................................5

        B.  The Contracting Defendants ................................................................6

        C.  The Marketing Defendants ..................................................................8

        D.  The Financing Defendant .....................................................................9

    II.   Individual Defendants ..................................................................................11

JURISDICTION ...........................................................................................................12

FACTS .........................................................................................................................13

    I.   Background on Student Debt-Relief and Forgiveness Programs ...........................13

    II.   Defendants' Unlawful and Deceptive Student Loan Debt-Relief
        Business Practices ......................................................................................15

        A.  Defendants' Unlawful and Deceptive Business Model ...................................16

        B.  Defendants' Unlawful Fees and Contracts ....................................................18

            i.    Pre-Equitable Transactions......................................................19

            ii.   Transactions Financed by Equitable............................................19

        C.  Defendants Violate Credit Repair Laws ........................................................22

        D.  Defendants Violate Telemarketing Sales Laws ...............................................24

        E.  Equitable's and/or its Contracting Defendant Partners' Loans
            Violate New York's Usury Cap ..................................................................26

        F.  In the Alternative, Equitable and its Contracting Defendant Partners
            Violate the Retail Instalment Sales Act ........................................................29

        G.  Equitable Violates Banking Law Article 11-B .................................................29

i

III.   Defendants' Deceptive and Unlawful Marketing Practices ....................................30

    A.  Deceptive Internet Advertisements................................................................30

    B.  Deceptive Direct Mail and Radio Solicitations .............................................32

    C.  Defendants' Further Deceptive Interactions with Borrowers ..........................35

IV.   Other Fraudulent, Deceptive and Illegal Practices ................................................41

V.   The Individual Defendants have Actual Knowledge of and/or Participate in the
    Fraudulent, Illegal and Deceptive Acts ................................................................42

The People of the State of New York, by their attorney, Barbara D. Underwood, Attorney General of the State of New York, respectfully allege, upon information and belief:

## INTRODUCTION

1.      Federal student loan debt has been steadily rising with outstanding federal student loan debt an estimated $1.34 trillion.

2.      Nearly ten million students who took out student loans from the federal government's student loan programs are having trouble staying current on their loan payments. As of May 2017, over 19% of borrowers in the current federal program, Direct Loans, were behind on their payments.

3.      Since at least 2014, Defendants have taken advantage of this student loan debt crisis by engaging in deceptive, fraudulent and illegal conduct targeted at consumers with student loan debt through their marketing, offering for sale, selling and financing of programs that purportedly provide student loan debt relief for a fee.  Defendants have formed new entities and relationships over time to carry out this scheme.

4.      Defendants, individually and/or in collaboration, offer, advertise and finance services that claim to help student loan borrowers struggling with debt reduce or eliminate their federal student loan debt.

5.      In advertising, marketing, and communicating with borrowers, Defendants make numerous misrepresentations, including but not limited to claiming they are part of or otherwise affiliated with the federal government and that the fees paid by borrowers will be applied to pay their student loan balances. Some Defendants also misrepresent that borrowers cannot apply on their own for debt consolidation or income-based repayment plans that are designed to help

1

borrowers manage student loan debt, when in fact, they can do so for free and without Defendants' involvement.

6.     Many of the Defendants hold themselves out as loan experts, when they are not, and provide advice to borrowers that can make them worse off in the end.  In addition to charging over $1,000 for services that are available for free, they worsen some borrowers' already precarious financial situation by providing incomplete and harmful advice.

7.     For example, they advise some borrowers they should consolidate their federal student loans without explaining that, in some cases, by doing so, consumers would lose months or years of loan payments they had already made that would qualify toward forgiveness of their loans under the Public Service Loan Forgiveness Program ("PSLF").  Relying on that advice, some of those borrowers consolidated their loans to their detriment.

8.     Other borrowers even take out additional loans based on Defendants' erroneous advice that with the assistance of their programs, the debt on the new loans will be forgiven.

9.     Through these misrepresentations, Defendants induce financially-struggling borrowers to enter into contracts in which Defendants agree to submit applications on the borrowers' behalf for federal student loan assistance, such as loan consolidation or other federal assistance programs. These contracts require borrowers to pay illegal, upfront fees.  Through approximately December 2015, such agreements required consumers to pay between $100 and $495 in upfront payments, before any service had been performed.

10.     In or around 2015, Defendant Equitable Acceptance Corporation ("Equitable" or the "Financing Defendant") entered into arrangements with certain of the Defendants to provide financing to these already imperiled borrowers to help them pay for the debt-relief services.

2

11.     As part of these arrangements, borrowers enter into a separate financing contract at usurious interest rates, typically nearly 21%, which adds hundreds of dollars to the debt-relief services contract price.  Such contracts are void under New York law.  *See* N.Y. Banking Law § 14-a and N.Y. Gen. Oblig. Law § 5-501.

12.     Because Equitable remits to the other Defendants the full amount of the consumer contract before the services promised have been fully completed, these arrangements also constitute illegal, upfront fees.

13.     The upfront fees, collected both before and after Equitable's involvement, violate federal and state consumer protection laws designed to protect credit-strapped consumers from falling prey to paying for worthless credit assistance and debt relief.  *See* New York General Business Law ("GBL") § 458-a; Federal Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1679, *et seq.*; the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310, *et seq.*; and New York GBL § 399-pp, *et seq.*

14.     In addition, the financing arrangement misleadingly claims to provide open-ended credit, a type of credit that contemplates repeat purchases, thus failing to provide the more complete consumer disclosures for closed-end credit required by the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*

15.     Through their deceptive and unlawful practices, Defendants have collectively misled thousands of borrowers nationwide, including thousands of New Yorkers, into paying thousands of dollars to purchase student loan debt-relief services that the borrowers could have received for free.

16.     The People of the State of New York, by Attorney General Barbara D. Underwood (the "NYAG") bring this action to seek restitution for borrowers who enrolled in

Defendants' programs as well as injunctive and equitable relief to redress Defendants' fraudulent and unlawful conduct. In addition, the NYAG seeks the imposition of civil penalties and costs.

## PARTIES

17.     Plaintiff is the People of the State of New York, by their attorney, Barbara D. Underwood, Attorney General of the State of New York ("NYAG").

18.     As described below, Defendants are divided into five groups according to their roles in this unlawful and deceptive scheme. The five "Contracting Defendants" sign contracts with borrowers and purport to provide debt-relief services by enrolling them in certain programs administered by the U.S. Department of Education ("DOE") and providing other monitoring services. The four "Marketing Defendants" are responsible for outreach to consumers, including by advertising, direct mail, and telephone solicitations. In addition, some of the Contracting Defendants also conduct their own marketing and borrower outreach. The two "Owner Defendants" are entities that own several of the Contracting Defendants, and the two "Individual Defendants" have leadership roles in one or more of the Owner Defendants. Finally, the Financing Defendant provides financing to borrowers to help them pay for the debt-relief services offered by the other Defendants.

19.     As set forth in paragraphs 20 - 51 below, many of the Defendants are inter-related companies with similar sounding names, such as Progress Advocates, LLC and Progress Advocates Group, LLC, and often operate from the same address and with overlapping principals. For example, six of the corporate Defendants have or had their principal place of business at 3100 Bristol Street, #300, Costa Mesa, California, namely Progress Advocates, LLC; Progress Advocates Group, LLC; Student Loan Support, LLC; Student Advocates, LLC; Student Advocates Group, LLC; and Student Advocates, Team, LLC. Two others - Debt Resolve, Inc.

4

and Student Loan Care, LLC - have their principal place of business at 22 Saw Mill River, 2nd

Floor, Hawthorne, New York.  In addition, Debt Resolve, Inc. is the majority owner of both

Progress Advocates, LLC and Student Loan Care, LLC and has conducted business at the same

address as both.

I.      **Corporate Defendants**

        **A. The Owner Defendants**

        20.      Defendant Debt Resolve, Inc. ("Debt Resolve") is a publicly traded company,

incorporated in Delaware, with its principal place of business at 22 Saw Mill River, 2nd Floor,

Hawthorne, New York.  Debt Resolve entered into a joint venture with LSH, LLC, a Delaware

limited liability company, to start Defendant Progress Advocates, LLC in 2014.  Debt Resolve

entered into a joint venture with Defendant Hutton Ventures, LLC to start Defendant Student

Loan Care, LLC in 2016.  Debt Resolve is the majority owner of both Progress Advocates, LLC

and Student Loan Care, LLC and has conducted business at the same address as both, namely,

1133 Westchester Avenue, Suite S-223, White Plains, New York.  Debt Resolve also signed a

2017 agreement with Equitable in which it agreed to "absolutely, unconditionally, and on a

continuing basis" pay any debts Student Loan Care, LLC owed to Equitable.

        21.      In its Form 10-Q filing for the period that ended September 30, 2017 and filed on

November 13, 2017 ("Debt Resolve 10-Q"), Debt Resolve states that it directly provides the

deliverables of its purported subsidiaries, Student Loan Care, LLC and Progress Advocates,

LLC, namely – the "completed, delivered and accepted student loan packages."  Debt Resolve

10-Q at Note 2 (Nov. 13, 2017), *available at*

https://www.sec.gov/Archives/edgar/data/1106645/000147793217005486/drsv_10q.htm   Debt

Resolve also represents that it sells such packages to borrowers.  *Id.*

5

22.     Defendant Hutton Ventures, LLC ("Hutton") is a Delaware limited liability company with its principal place of business at 4 Hutton Centre, Suite 210, Santa Ana, California.  According to the Debt Resolve 10-Q, Hutton partnered with Debt Resolve to form Student Loan Care, LLC.  As a partner with Debt Resolve in its joint venture Student Loan Care, LLC, which as described below in paragraph 26, is located in New York, it engages in business in New York.

23.     Hutton and Debt Resolve are collectively referred to as the "Owner Defendants."

**B. The Contracting Defendants**

24.     Defendant Progress Advocates, LLC ("Progress Advocates") is a Delaware limited liability company with its principal place of business at 3100 Bristol Street, #300, Costa Mesa, California.  In 2015, if not before, it also conducted business at 1133 Westchester Ave, Suite S-223, White Plains, New York.  According to the Debt Resolve 10-Q, Progress Advocates was founded in 2014 as a joint venture between Debt Resolve (51%) and LSH, LLC (49%), a Delaware limited liability company.  Per the Debt Resolve 10-Q, Progress Advocates entered into contracts with borrowers for student loan debt-relief services from 2014 until around February 2016.  In February 2016, it ceased making new agreements with borrowers, but Progress Advocates continues to service its existing agreements.

25.     Defendant Progress Advocates Group, LLC ("Progress Advocates Group") is a Delaware limited liability company formed in November 2014 with its principal place of business at 3100 Bristol St. #300, Costa Mesa, California.  Progress Advocates Group entered into contracts with borrowers for student loan debt-relief services, including ones with New York residents.  It also provides back-end services to Progress Advocates, including for New York consumers, such as submitting applications to DOE on its behalf and gathering information and

documents from borrowers who contracted for debt-relief services with Progress Advocates. It filed a Chapter 7 Voluntary Petition Non-Individual Bankruptcy on December 20, 2017 in the Central District of California.

26.     Defendant Student Loan Care, LLC ("Student Loan Care") is a Delaware limited liability company formed in April 2016 that is a joint venture between Settl.it, a 100% owned subsidiary of Debt Resolve, and Hutton. Student Loan Care's principal place of business is at 22 Saw Mill River Rd, Floor 2, Hawthorne, NY, and it has another office at 4 Hutton Centre, Suite 210, Santa Ana, California. Around at least May 2016, it also conducted business at 1133 Westchester Avenue, Suite S-223, White Plains, New York. In addition to providing some marketing services described below at paragraph 33, Student Loan Care currently enters into contracts with borrowers for student loan debt-relief services. It also provides back-end services, such as submitting paperwork to DOE, and directly markets to and solicits borrowers.

27.     Defendant Student Loan Support, LLC ("Student Loan Support") is a California limited liability company that was formed in May 2013 and that had its principal place of business at 3100 Bristol Street, #300, Costa Mesa, California. Before 2015, Student Loan Support entered into contracts with borrowers for student loan debt-relief services, including with New York consumers. It also performed student loan document preparation and processing for Progress Advocates, including for New York consumers. By December 31, 2014, Student Loan Support ceased making new agreements with borrowers and Progress Advocates Group took over Student Loan Support's business. Student Loan Support has an F rating from the Better Business Bureau ("BBB"), its lowest rating. BBB ratings are based on a number of factors, including complaint history and whether the company has failed to resolve the

7

underlying causes of a pattern of complaints.   Student Loan Support filed a Chapter 7 Voluntary Petition Non-Individual Bankruptcy on October 16, 2018 in the Central District of California.

28.     Defendant Student Advocates Team, LLC ("Student Advocates Team") is a Delaware limited liability company that was formed in November 2016, with its principal place of business at 3100 Bristol Street, #300, Costa Mesa, California.  In addition to providing some marketing services described below at paragraph 32, Student Advocates Team currently contracts with borrowers for student loan debt-relief services, including with New York residents.

29.     Progress Advocates, Progress Advocates Group, Student Advocates Team, Student Loan Care, and Student Loan Support will be collectively referred to as the "Contracting Defendants."

**C. The Marketing Defendants**

30.     Defendant Student Advocates, LLC ("Student Advocates") is a Delaware limited liability company with its principal place of business at 3100 Bristol Street, #300, Costa Mesa, California.  It handled marketing and sales for Progress Advocates, Student Loan Support, and Progress Advocates Group from around 2014 until July 11, 2016.  It sent advertisements to and conducted sales calls with New York consumers.

31.     Defendant Student Advocates Group, LLC ("Student Advocates Group") is a Delaware limited liability company with its principal place of business at 3100 Bristol Street, #300, Costa Mesa, California.  It handled marketing and sales for Progress Advocates, Student Loan Support, and Progress Advocates Group from approximately July 11, 2016 until November 28, 2016.  It sent advertisements to and conducted sales calls with New York consumers.

8

32.     Student Advocates Team, in addition to contracting with borrowers as described above in paragraph 28, has handled marketing and sales for Progress Advocates, Student Loan Support, and Progress Advocates Group since November 28, 2016.  It sent advertisements to and conducted sales calls with New York consumers.

33.     Student Loan Care, in addition to contracting with borrowers as described above in paragraph 26, also does its own marketing and sales for its contracts.

34.     Defendants Student Advocates, Student Advocates Group, Student Advocates Team, and Student Loan Care are collectively referred to as the "Marketing Defendants."  They collectively have provided marketing services to the Contracting Defendants over a period of years continuing through the present.

35.     Because Student Advocates Team and Student Loan Care also enter into contracts with consumers directly for debt-relief services, they are also included in the Contracting Defendants group described above.

**D. The Financing Defendant**

36.     Defendant Equitable Acceptance Corporation ("Equitable" or the "Financing Defendant") is a Delaware corporation with its principal place of business at 1200 Ford Road, Minnetonka, Minnesota.  Equitable has an F rating from the BBB.

37.     Equitable is not licensed in New York as either a lender or a sales finance company.

38.     Equitable provides loans to a variety of "small businesses and independent dealers," ranging from companies that provide cookware and home goods to medical and dental services.  Equitable Homepage, https://equitableacceptance.com/ (last visited Dec. 12, 2018);

9

Equitable Dealer Services, https://equitableacceptance.com/dealer-services/ (last visited Dec. 12, 2018).

39.     Equitable also provides the funds and financing agreements for borrowers and purchases the agreements and/or is the assignee of the agreements from the Contracting Defendants that it works with.

40.     Equitable drafts the financing agreements, which are titled "Equitable Acceptance Revolving Credit Plan" (the "Equitable Credit Plan" or the "Credit Plan") and requires that their agreements be used by the Contracting Defendants if they want Equitable to provide the financing.

41.     Equitable purchases the Credit Plan agreements from the Contracting Defendants it works with within days of the borrowers signing them and is the assignee of the agreements.

42.     Equitable also requires borrowers to authorize Equitable, and not the Contracting Defendants, to use ACH to debit their bank accounts monthly to make payments.

43.     As such, borrowers directly pay Equitable for services to be provided by the Contracting Defendants.

44.     All of the borrowers' Credit Plan agreements also provide that Equitable, as the holder of such consumer credit agreements, is subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

45.     As alleged below, Equitable has engaged in its own deceptive and misleading conduct.

46.     In addition, by financing and purchasing the contracts between borrowers and the Contracting Defendants, Equitable aids and abets the deceptive and fraudulent business practices of the co-Defendants.

10

47.     Equitable has received hundreds of complaints from the BBB, the CFPB, and other sources over the past several years, which describe in detail the illicit practices of the Marketing and Contracting Defendants alleged herein.  Thus, Equitable knows of its co-Defendants' deceptive and fraudulent activities.  Equitable also provided substantial assistance in furtherance of these deceptive and fraudulent practices by providing the financing borrowers need to make purchases from the other Defendants.

48.     Equitable is responsible for the fraudulent and illegal conduct alleged herein and is a necessary party to award complete relief.

**II.     Individual Defendants**

49.     Defendant Bruce Bellmare is the CEO of Debt Resolve, the majority owner of both Progress Advocates and Student Loan Care, and, along with another individual, oversees the management and financial affairs of Student Loan Care.  Before becoming the CEO of Debt Resolve in May 2016, he served on the board of Debt Resolve as a Director.  Upon becoming the CEO of Debt Resolve, he reviewed the operations of Progress Advocates and Student Loan Care and determined that Debt Resolve should, through Student Loan Care, offer student loan debt-relief services using the Equitable Credit Plans.  He resides in New York.

50.     Defendant Stanley E. Freimuth was the CEO of Debt Resolve and Progress Advocates and on the Board of Managers of Progress Advocates from March 1, 2014 through May 16, 2016 and continues to act as a consultant to Debt Resolve.  As the CEO of Progress Advocates, he oversaw its executive management and financial affairs.  Freimuth signed, as CEO of Progress Advocates, a Master Dealer Agreement with Equitable that set the terms for Equitable's purchase of the Equitable Credit Plans which Progress Advocates entered into with borrowers.  He resides in Connecticut.

11

51.     Defendants Freimuth and Bellmare are collectively referred to as the "Individual Defendants."

## JURISDICTION

52.     The NYAG initially filed this case in New York County Supreme Court on September 20, 2018.  That Court had jurisdiction pursuant to New York Executive Law § 63(12); GBL §§ 349 and 350, 399-pp and 458-j; 15 U.S.C. § 1679.h(c); and 16 C.F.R. § 310.7. Executive Law § 63(12) empowers the NYAG to seek injunctive relief, restitution, disgorgement, damages, and costs when any person or business entity has engaged in or otherwise demonstrated repeated or persistent fraudulent or illegal acts in the transaction of business.  GBL Article 22-A, §§ 349 and 350, authorizes the NYAG to seek injunctive relief, restitution and civil penalties for deceptive acts or practices and false advertising.  GBL § 399-pp deems any violation of New York's telemarketing statute a deceptive act and practice, making it subject to the NYAG's enforcement power provided in GBL Article 22-A.  GBL § 458-j authorizes the NYAG to seek injunctive relief, restitution and penalties for violations of New York's credit repair statute.  16 C.F.R. § 310.7 authorizes the NYAG to seek relief for violations of the TSR, 16 C.F.R § 310 *et seq*.  15 U.S.C. § 1679h(c) authorizes the NYAG to seek injunctive relief, damages, costs and attorney fees for violations of CROA, 15 U.S.C § 1679 *et seq*.

53.     On October 24, 2018, Defendant Equitable removed this action to this Court pursuant to 28 U.S.C. §§ 1331, 1441(a), and 1446, and the NYAG did not move to remand.

54.     The NYAG has provided pre-litigation notice pursuant to GBL §§ 349(c) and 350.

## FACTS

### I.    Background on Student Debt-Relief and Forgiveness Programs

55.    Federal student loans are issued to borrowers through programs created by federal statutes.

56.    Once funds are issued to a borrower, the loans are assigned to a loan servicer to handle various administrative tasks associated with the loans.

57.    Loan servicers are not part of DOE and are separate companies that have contracts with DOE to handle billing, payment collection, and various other services for borrowers.  They are the borrower's primary point of contact with respect to his or her federal student loans.

58.    DOE offers a number of programs to help borrowers who are having difficulty paying back their federal student loans.  DOE offers these programs to borrowers free of charge.

59.    For example, DOE offers deferment or forbearance of loan payments.  A deferment or forbearance allows borrowers to stop making payments or reduce the amount of their payments temporarily.  During periods of forbearance, and periods of deferment for some loans, interest continues to accrue and, if not paid on a monthly basis, is compounded at the end of the period, resulting in increased total loan balances.  Deferments and forbearances also extend the amount of time it will take a borrower to pay back the loan.  But they provide assistance to borrowers who cannot make their loan payments for a defined, limited period of time due to temporary changes in their circumstances.

60.    DOE also offers a number of income-based repayment programs that allow borrowers to pay only a certain percentage of their income toward their student loans.  Under these programs, the remaining loan principal is forgiven after a certain number of years of

payments.  Income-based repayment plans make a borrower's monthly payment amounts more manageable, but they will in most circumstances extend the repayment period and may result in the borrower paying more over time.

61.     Loan forgiveness is also available to certain limited groups of borrowers, such as borrowers who can demonstrate a "total and permanent disability" sufficient to obtain a "Total and Permanent Disability Discharge" or borrowers who enter certain types of professions, such as teaching or certain jobs in the public sector ("Public Service Loan Forgiveness" or "PSLF"). Eligibility for PSLF requires the borrower to make 120 qualifying payments under particular circumstances.  The PSLF application for loan forgiveness is filed only after the 120 qualifying payments are made.

62.     Finally, DOE offers loan consolidation.  Loan consolidation allows borrowers to combine two or more eligible federal loans into a single loan with a fixed interest rate that is a weighted average of the interest rates on the loans being consolidated.  When consolidating, borrowers often extend the term of the loan and reduce monthly payments.

63.     Consolidation may offer certain advantages to some borrowers, such as allowing borrowers in an older federal loan program to be eligible for income-based repayment programs that have more generous terms than would otherwise be available.

64.     But whether a borrower should consolidate his loans requires a careful analysis of each borrower's particular situation because there may be serious negative consequences to some borrowers from consolidation.

65.     Even though consolidation reduces monthly payments, it increases the total cost of the loan.  There are other ways in which a borrower can lower monthly payments, and

14

therefore consolidation is often not the most beneficial option available to a borrower on a tight monthly budget.

66.     Consolidation may also cause the loss of certain benefits associated with the original loans.  For example, for borrowers in the current Direct Loan program, consolidation may eliminate years of payments on the original loans that were qualified to be counted toward PSLF after 120 monthly payments.  As such, loan consolidation is inadvisable for many borrowers, especially those in the current Direct Loan program and offers no significant benefit for many others.

67.     Borrowers can learn about and, where necessary, fill out an application to enroll in all of these loan modification options, at no cost, by contacting their federal loan servicer or by going to DOE's student loan website at https://studentloans.gov/myDirectLoan/index.action.

## II.     Defendants' Unlawful and Deceptive Student Loan Debt-Relief Business Practices

68.     Defendants seek to capitalize on struggling borrower repayment problems by targeting borrowers with large loan balances, and then marketing, selling, and financing student loan debt-relief services for them.

69.     Although Defendants have formed new debt-relief entities and relationships over time, they have all followed the same basic business model.  In fact, as noted above in paragraphs 20-51, many of the Defendants – Progress Advocates, Progress Advocates Group, Student Loan Support, Student Advocates, Student Advocates Group, and Student Advocates Team - have operated from the same offices in Costa Mesa, California, and use the same personnel to run these various entities.

### A. Defendants' Unlawful and Deceptive Business Model

70.     After initially contacting borrowers via the marketing efforts described in

paragraphs 143 - 196 below, the Contracting Defendants rely on individuals called "Student

Loan Advisors" to sell student loan debt-relief agreements to borrowers by phone.

71.     Despite holding themselves out as being knowledgeable about student loans, these

so-called Student Loan Advisors are in reality telemarketers with no specialized experience or

expertise, who sell virtually identical student loan debt-relief agreements to borrowers using the

same sales scripts and pitches.

72.     In most cases, Student Loan Advisors were or are employed by one of the

Marketing Defendants. For example, Student Advocates provided marketing and selling of debt-

relief services for Student Loan Support in 2014, Progress Advocates from 2014 to February

2016, and Progress Advocates Group from around November 2014 until July 2016. Student

Advocates Group provided marketing and selling of debt-relief services for Progress Advocates

Group from July to November 2016, followed by Student Advocates Team from November 2016

to the present.

73.     Student Loan Care employs its own Student Loan Advisors and does not employ

the Marketing Defendants for this purpose. And Student Advocates Team, in addition to

performing marketing services for other Contracting Defendants, also markets its own debt-relief

services to borrowers.

74.     Student Loan Advisors typically speak to borrowers over the telephone and try to

sell them debt-relief services. Once a Student Loan Advisor has convinced a borrower to enroll

in debt-relief services, they email the borrower a packet of contracts to execute, typically during

the same phone call.

75.     This packet of contracts includes the Contracting Defendant's "Document Preparation and Service Agreement," and other agreements and disclosures pertaining to the financing of the fee for the Contracting Defendants' services, which include: (a) the "Equitable Credit Plan" agreement, which is called the "REVOLVING CREDIT PLAN," (b) the Equitable Acceptance Credit Request Authorization, authorizing Equitable to run the borrower's credit, and (c) the Equitable Acceptance Auto Pay Terms of Use, authorizing Equitable to use automatic ACH debits from the borrower's bank accounts to obtain payments.

76.     In the "Document Preparation and Service Agreement," the Contracting Defendants agree to analyze the consumer's student loan situation, review the information sent by the consumer and complete and file application forms with DOE for loan consolidation or DOE-sponsored debt-relief programs.  The Contracting Defendants also agree to monitor the application process and provide status updates to the borrower.

77.     Additionally, the contracts of Progress Advocates, Progress Advocates Group, Student Loan Care and Student Advocates Team include monthly monitoring and a yearly audit of the loan assistance program obtained. For example, Student Loan Care's contract states "[o]nce a consolidation loan is secured or other beneficial result is obtained, Company will continue to monitor Client's account monthly and collect the necessary paperwork from Client to make sure account is up to date and ready for the yearly income validation.  Prior to the anniversary of the loan, Company will provide required documents and instructions, if indicated, to Client for submission to the DOE."  Student Advocates Team's contracts also provide for purportedly "free" annual income verifications for two to three years for certain income-based repayment plans.

17

78. The Credit Plan provides a loan to finance the fee for the Contracting Defendants' debt-relief services. Borrowers pay back this loan in monthly installments, plus interest.

79. Equitable then purchases the Credit Plan from the Contracting Defendant within a few days of the borrower signing it. As a result, if they work with Equitable, borrowers do not make a single payment to the Contracting Defendants.

80. Many consumers electronically sign and return the contracts, including the Credit Plan, credit authorization, and ACH auto pay authorizations by email, often during the same telephone call.

**B. Defendants' Unlawful Fees and Contracts**

81. Student Loan Advisors are paid approximately $10 an hour and earn the bulk of their income through commissions.

82. Student Loan Advisors earn commissions ranging from approximately $75 to $200 for each borrower who signs up, depending on how that borrower makes his or her payments. They also earn additional monthly bonuses up to $30 per file if 45 or more borrowers in the Student Loan Advisor's files paid the Contracting Defendants' fees during that month.

83. The Contracting Defendants typically charge each borrower over $1,000 for their services. The structure of these fees have varied over time but usually include an upfront payment to the Contracting Defendants before they complete work on behalf of the borrower, followed by an installment payment plan over a period of months.

84. As explained in paragraphs 85-142 below, Defendants' fees and contracts violate multiple state and federal laws.

### i.    Pre-Equitable Transactions

85.      From at least 2014 to 2015, Progress Advocates, Progress Advocates Group, and

Student Loan Support required consumers to pay directly to them an upfront fee ranging from

$100 to $495 before they would file any application with DOE on a borrower's behalf.  After the

filing of the application with DOE, the borrower then paid the Contracting Defendants twenty-

one monthly payments of $39, or $819 after the initial upfront fee of $100 to $495, for a total

cost ranging from $919 to $1,314.  Progress Advocates and Progress Advocates Group used this

fee structure until sometime in 2015.  Student Loan Support used a similar fee structure until the

end of 2014, when it ceased making new agreements with borrowers.

86.      Beginning in 2015 until approximately the end of 2015, Progress Advocates

Group's and Progress Advocates's contracts claimed that any upfront payments from consumers

would be held in "trust" and that they would not receive those upfront payments until they had

actually filed documents for the borrowers with DOE.

### ii.    Transactions Financed by Equitable

87.      Equitable entered the student loan industry in 2015 when it began financing

and/or acquiring borrower contracts.  Equitable has partnered with over forty student debt

companies, including Progress Advocates, Progress Advocates Group, Student Advocates Team,

and Student Loan Care (*i.e.*, all of the Contracting Defendants except Student Loan Support, or

"Equitable's Contracting Defendant Partners").

88.      By mid-2015, Progress Advocates stopped taking payments from borrowers

directly and required them to enter into a financing agreement with Equitable.  Progress

Advocates contracts dating from February 2015 provide for a $495 upfront payment, following

19

by monthly payments of $39. Contracts dating from June 2015 provide for financing with Equitable.

89.     Under the terms of Progress Advocates's arrangement with Equitable, the borrower was required to make 48 monthly payments of $39 to Equitable, for a total of $1,872 ($1,314 in principal and $558 in interest, at an interest rate of 20.99%).

90.     Student Loan Care and Progress Advocates Group began working with Equitable under these same terms in June 2016.

91.     Under the terms of Equitable's contracts with Progress Advocates, Progress Advocates Group, Student Loan Care, and later, Student Advocates Team, Equitable agrees to purchase borrowers' contracts from these entities by paying them the full amount of the contract as an upfront payment, within days of the borrower signing the Credit Plan, months and in some cases years before the debt-relief services are actually performed.

92.     Equitable's financing model for Student Loan Care and for Student Advocates Team changed again in 2017, and now expressly requires an upfront payment from borrowers enrolling in Student Loan Care's and Student Advocates Team's debt-relief services of between $99 and $199 to Equitable to be held in an escrow account by a third party.

93.     For example, one contract provides "[w]ith this financing option you must initiate a debit entry to your checking account (or savings account) at your financial institution (my "Primary Bank Account"), in the amount of $150.00 within 7 calendar days as of the date of this agreement. This initial payment of $150 will be deposited into a Customer's Special Purpose Account. The Customer's Special Purpose Account is an Escrow account for the $150.00 debited within 7 calendar days of this agreement and will NOT be released to the Student Advocates Team until Student Advocates Team either 1) verifies completion of your application

20

for a Federal Student Loan Consolidation or 2) changes your repayment plans or reenrollment on

your behalf, or alternatively, completes another Department of Education sponsored program

suitable for Client."

94.     Student Loan Care expressly requires all of their borrowers to agree to the

Equitable Credit Plan. For example, Student Loan Care in its sales script directs its Student Loan

Advisors to tell borrowers:

> Now as part of the evaluation for financing, I would like to pull
> your credit to determine whether you meet financing criteria for
> the third party finance company, Equitable Acceptance
> Corporation, who will be charging you a monthly payment for our
> services if you proceed with us.  I would need a clear "YES" to
> continue.  Do I have your permission?
>
> ***DO NOT CONTINUE UNLESS YOU RECEIVE "YES"
> FROM CLIENT***
>
> (If "NO") "Unfortunately, our product is financed, and to have our
> services rendered we would need to see if you are eligible for
> financing."

95.     Progress Advocates, Progress Advocates Group and Student Advocates Team also

steer their borrowers towards financing using the Equitable Credit Plan.  For example, Student

Advocates' Student Loan Advisors, who sold agreements for Progress Advocates and Progress

Advocates Group, were directed in their sales script to say:

> Now in order to consolidate your loans the first payment for our
> processing would be $1,377, now most clients we deal with don't
> have the ability to afford the first payment in full so there is also a
> financing option.

And later in the sales call:

> The $1,377 that was financed by Equitable Acceptance is your $49
> payment which will cover the initial consolidation process and
> proper switch into the correct repayment plan with your new
> servicer.

96.     Upon information and belief, and as reflected consistently in consumer complaints, after the Contracting Defendants (except for Student Loan Support) partnered with Equitable, virtually all borrowers were steered into paying for services through monthly instalments payments to Equitable, and consumers did not make payments either to the Contracting Defendants or in a single lump-sum.

**C.  Defendants Violate Credit Repair Laws**

97.     Federal and New York law regulates the provision and marketing of credit repair services, in particular by requiring certain disclosures to consumers and prohibiting the charging of upfront or advance fees for credit repair services.  *See generally* CROA, 15 U.S.C. § 1679 et seq.; GBL Article 22-BB.  These laws were instituted to protect consumers from the worst abuses of the credit repair industry, which collected large fees but rarely improved consumers' credit.  By law, any contract for credit repair services sold with advance fees or without the necessary disclosures is void and unenforceable.  15 U.S.C. § 1679f(c); GBL § 458-g.

98.     The Federal CROA defines "credit repair organization" to mean "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money . . . for the express or implied purpose of improving any consumer's credit record, credit history, or credit rating; or providing advice or assistance to any consumer with regard to any [such] activity or service." 15 U.S.C. § 1679a(3)(A)(i)-(ii).

99.     Similarly, New York law defines "credit services business" to mean "any person who sells, provides, or performs, or represents that he can or will sell, provide or perform, a service for the express or implied purpose of improving a consumer's credit record, history, or

22

rating or providing advice or assistance to a consumer with regard to the consumer's credit record history or rating in return for the payment of a fee." GBL § 458-b(1).

100.    The Contracting and Marketing Defendants' services fit the definition of credit repair services under federal and New York law by selling and providing a service with the express or implied purpose of improving the borrowers' credit record, history or rating.

101.    For example, Student Advocates, which marketed on behalf of a number of co-Defendants, represented on its website at least through August 2016 that "Student loan consolidations with Student Advocates usually have a positive effect on credit." and "Improve Your Credit - Many of the student loan borrowers we've worked with have seen dramatic improvements in their credit."

102.    When enrolling borrowers on behalf of Progress Advocates, Progress Advocates Group, or Student Loan Support, Student Advocate's Student Loan Advisors are instructed to read the following script to borrowers after looking at the borrowers' loans: "If approved [for consolidation] the first thing done in a government program is the Department of Education will pay off every single one of your outstanding federal loans and consolidate them into one new loan.  This will not only give you a fresh start but it will also lower the amount of trade lines you have on your credit report which would report as a positive on your credit."  Student Loan Care's Student Loan Advisors read a similar script to borrowers.

103.    As alleged above in paragraphs 85 - 96, despite some changes in how the fees were structured, the Contracting Defendants have collected advance fees from borrowers since they began operating to the present, in violation of CROA, GBL Article 28-BB, 15 U.S.C. § 1679b and GBL §458-e.  Initially those advance fees were directly received by the Contracting Defendants from consumers, whether they were held directly or "in trust."  Then the Contracting

Defendants received the upfront fees by way of Equitable, when Equitable paid the full price of borrowers' contracts to the Contracting Defendants.

104.     In violation of New York and federal credit repair laws, Defendants also fail to provide consumers with separate written disclosures prior to execution of the contract for credit services which set forth the consumer's legal rights to receive, review and dispute credit information in the consumer's credit report, as well as "the terms and conditions of payment, including the total amount of all payments to be made . . . ." 15 U.S.C. §§ 1679c & 1679d; GBL § 458-d.

105.     Nor do the contracts for credit repair services include other information required by federal and New York law, including, for example, (i) a "complete and detailed statement" of the services to be performed and the results that are sought; (ii) a copy of the consumer's credit report with any negative entries marked; (iii) a statement that no advance fees may be collected legally; and (iv) a notice of the consumer's right to cancel the contract within three days along with an attached notice of cancellation form. 15 U.S.C. §§ 1679c & 1679d; GBL § 458-f.

**D.     Defendants Violate Telemarketing Sales Laws**

106.     Federal and New York law specifically protects consumers from deceptive and abusive telemarketing campaigns, including prohibiting the charging of advance fees for certain services, such as debt-relief and/or credit repair services  *See* TSR, 16 C.F.R § 310, *et seq.* and New York GBL § 399-pp., *et seq.*

107.     The Federal TSR defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R § 310.2(gg).

24

108.    The Federal TSR defines a "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(ff).

109.    New York law defines "telemarketing" similarly as "any plan, program or campaign which is conducted to induce payment or the exchange of any other consideration for any goods or services by use of one or more telephones and which involves more than one telephone call by a telemarketer in which the customer is located within the state at the time of the call." GBL § 399-pp(2)(k).

110.    New York law defines a "telemarketer" similarly as "any person, who, for financial profit or commercial purposes in connection with telemarketing, either initiates, or initiates and receives telephone calls to or from a customer when the customer is in this state or any person who directly controls or supervises the conduct of a telemarketer." GBL § 399-pp(2)(j).

111.    The Federal TSR defines "debt relief services" as "any program or service represented, directly or by implication, to renegotiate, settle or in any way alter the terms of payment or other terms of the debt. . ."  TSR 16 C.F.R. § 310.2(o).

112.    The Contracting and Marketing Defendants are engaged in telemarketing in New York within the meaning of both the TSR and GBL § 399-pp because they made or make and/or received or receive telephone calls to or from customers to induce payment or the purchase of their services.

113.    As alleged in paragraphs 85 -105, above, the Contracting Defendants are engaging in credit repair services and collect advance fees from consumers.  As such, the

Contracting Defendants violate 16 CFR § 310.4(a)(2) and/or GBL § 399-pp(6)(9), which both prohibit collecting upfront payments for improving a person's credit history.

114.    As alleged in paragraphs 85 - 105, above, the Contracting Defendants are also engaging in debt-relief services and collect advance fees from consumers.  As such, the Contracting Defendants violate 16 CFR § 310.4(a)(5), which prohibits collecting upfront payments for debt-relief services.

115.    As described in paragraphs 197 - 201 below, the Contracting and Marketing Defendants have violated other provisions of the TSR and GBL § 399-pp.

   **E.    Equitable's and/or Its Contracting Defendant Partners' Loans Violate New York's Usury Cap**

116.    Since 2015, Equitable has loaned money to consumers, including New York consumers, to pay for the debt relief services to be provided by Progress Advocates, Progress Advocates Group, Student Advocates Team, and Student Loan Care, and collects payments from borrowers.

117.    While the financing agreements are titled "Equitable Acceptance Revolving Credit Plan," they are, in reality, loans at usurious interest rates.

118.    Indeed, Equitable represents to consumers, and the public at large, that it is a lender.  On its website, one of the FAQ's is "Q. Can I pay my *loan* off early?  A. Of course!" Equitable Frequently Asked Questions, https://equitableacceptance.com/faqs/ (last visited Dec. 12, 2018) (emphasis added).

119.    In the agreement consumers sign to obtain financing, Equitable calls the financing it is providing a "Revolving Credit Plan" or "credit plan" and lists a percentage "APR."

120.    In addition, in a case currently pending before the Southern District of New York, Equitable has represented that the Credit Plans "were in fact a loan," noting that the "two

26

Plaintiffs [in that case] are college graduates. A credit plan is a loan." *Williams v. Equitable Acceptance Corp., et al.,* No. 18-cv-07537 (S.D.N.Y.), Letter dated Oct. 11, 2018, ECF No. 19; *see also id.,* Mem. of Law in Support of Mot. To Dismiss at 2, ECF No. 25.

121.    Equitable has further argued in that case that "[e]ach Plaintiff knew s/he was taking out a loan and all material aspects of that loan, including the amount of the debt, the interest rate, and the repayment terms." Mem. of Law in Support of Mot. To Dismiss at 12-13, ECF No. 25.

122.    Equitable's Contracting Defendant Partners have similarly asserted that the financing is being provided by Equitable and not them.

123.    For example, Student Loan Care expressly states in its Document Preparation and Service Agreement with borrowers:

> The [Equitable] Credit Plan pays all authorized services provided by Student Loan Care, LLC under this Agreement.  In no way does Student Loan Care, LLC offer its own Credit Plan or administer the Credit Plan offered by Equitable Acceptance Corporation/Specialty Financing. . .
>
> Company [Student Loan Care, LLC] is not a lender, a debt consolidation company, or a law firm and does not provide legal advice or act as Client's legal counsel in front of the DOE.

124.    Progress Advocates Group  had virtually identical language in their Document Preparation and Service Agreements, which read:

> The payment of $1314 for Company's services . . . are executed by a Third Party (Equitable Acceptance Corporation) in a separate document using a Revolving Credit Plan that you have agreed with them to set up . . . The Revolving Credit Plan pays all authorized services provided by Progress Advocates Group under this Agreement . . . In no way does Progress Advocates Group offer its own Credit Plan or administer the Credit Plan offered by Equitable Acceptance Corporation. . .

> Progress Advocates Group, LLC is not a lender, a debt
> consolidation company, or a law firm.

125.    Contracts from Progress Advocates also had this same language in them.

126.    Indeed, Equitable performs the functions of a lender, including providing the financing, drafting the agreements and making all underwriting decisions regarding the loans.

127.    Equitable requires that borrowers sign a Credit Request Authorization authorizing Equitable to perform credit checks of the borrowers.

128.    Equitable also requires borrowers to meet Equitable's criteria for financing before its Contracting Defendant Partners agree to perform any services for the borrowers who have signed the agreements.

129.    To the extent that Equitable is not providing these loans, its Contracting Defendant Partners are.

130.    On the vast majority of the loans in New York, Equitable and/or its Contracting Defendant Partners collect interest rates of 20.99%.

131.    In a small minority of the loans in New York, Equitable and/or its Contracting Defendant Partners collect interest rates of 17.99%.

132.    Because Equitable and/or its Contracting Defendant Partners are not  licensed lenders in New York, these interest rates exceed the 16% civil usury limit for finance agreements covered by New York Banking Law § 14-a and New York General Obligations Law § 5-501.

133.    Loans made to New York consumers in excess of New York's usury laws are void, and as such, no payment is due.  N.Y. Banking Law § 14-a, N.Y. Gen. Oblig. Law §§ 5-501, 5-511.

134.    Such loans also contravene a fundamental public policy of the State of New York.

28

F.     **In the Alternative, Equitable and its Contracting Defendant Partners Violate the Retail Instalment Sales Act**

135.   To the extent that Equitable's "Revolving Credit Plan" agreements are not loans, they are either retail instalment credit agreements or retail instalment obligations subject to the New York Retail Instalment Sales Act, Personal Property Law ("PPL") § 401 *et seq.*

136.   Retail instalment obligations as defined in PPL § 401(7) are agreements "entered into in this state, pursuant to which the buyer promises to pay, in instalments, the time sale price or prices of goods and/or services, or any part thereof."

137.   Retail instalment credit agreements as defined in PPL § 401(8) are agreements "entered into in this state, pursuant to which the buyer promises to pay, in instalments, his outstanding indebtedness from time to time to a retail seller, not evidenced by a retail instalment contract or obligation, for one or more items of goods or services..." The term also "includes a retail instalment credit agreement entered into by a financing agency ..."

138.   The Revolving Credit Plan agreements at issue here fail to comply with the requirements for either retail installment obligations or credit agreements.

139.   For example, they fail to make required disclosures, including but not limited to failing to include the following: the words "RETAIL INSTALMENT OBLIGATION" or "RETAIL INSTALMENT CREDIT AGREEMENT" in ten point font at the top of the contract and "directly above the space reserved for the signature of the buyer"; the "notice to buyer" with language specified by statute; and the place of business of the seller.  PPL §§ 402, 413.

G.     **Equitable Violates Banking Law Article 11-B**

140.   To the extent that Equitable purchases or acquires retail instalment contracts, obligations or credit agreements made by its Contracting Defendant Partners, it operates as a sales finance company as defined in New York Banking Law § 491(7).

29

141.    Banking Law § 492(1) prohibits any person, except "a bank, savings bank, savings and loan association, trust company, private banker, credit union, investment company organized under article twelve of this chapter and authorized to accept deposits, national bank, federal savings association, federal credit union, or out-of-state state bank" to engage in the business of a sales finance company in New York without a license.

142.    Equitable is not, and never has been, licensed as a sales finance company in New York.

### III.    **Defendants' Deceptive and Unlawful Marketing Practices**

143.    The Contracting Defendants have advertised and continue to advertise their services in a variety of ways, including through direct mail solicitations; radio advertisements; Internet solicitations, including targeted advertisements using Facebook and other social media; and their own websites.  In all of its forms, their advertising contains numerous express and implied misrepresentations.

### A.    **Deceptive Internet Advertisements**

144.    The Contracting Defendants' Internet advertisements contain numerous express and implied misrepresentations.

145.    For example, Student Advocates, which markets for a number of the Contracting Defendants, placed Facebook ads on students' newsfeeds from approximately February 2015 to June 2017 substantially similar to the one below.

30



**U.S. GOVERNMENT APPROVES GRADUATED REPAYMENT PLAN**

The ads, sent to former students of various colleges and universities with large student loans, claim that it is "Breaking News" that the U.S. Government approved a graduated repayment plan, implying that the program is new. In fact, the program became law a decade ago.

146.    In another example, Student Advocates's website claims on its "About Us" page that it has "trained student loan experts," who are "professional, experienced and highly trained."

147.    In fact, these so-called "Student Loan Advisors" receive minimal training and are not student loan experts; rather, they are sales people compensated largely by commissions, as explained above in paragraphs 71 and 81-82.

148.    Student Advocates's website also states that it charges a fee "only after we've completed work."

149.    But the Contracting Defendants that do their marketing in part through the Student Advocates website routinely require borrowers to enter into a financing agreement with Equitable before they begin any work on the borrower's application, under which borrowers are obligated to make 48 monthly payments of $39, for a total of $1,872. And Student Loan Care

31

and Student Advocates Team currently require borrowers to pay an upfront fee to Equitable which purportedly is held in escrow even before any work is done by them.

**B.    Deceptive Direct Mail and Radio Solicitations**

150.    Student Loan Care sends direct mail solicitations to consumers with student loan debt that deceptively appear to be from a governmental agency or an entity affiliated with a government agency to convince consumers to contact them for purported debt-relief services.

151.    For example, the envelopes contain no indication that they are sent by a private entity for a fee-based service.  Rather, the envelope creates a false sense of urgency by stating "PERSONAL & CONFIDENTIAL FINAL NOTICE" and the warning "SECURED DOCUMENT."



PERSONAL & CONFIDENTIAL
FINAL NOTICE

PRESORTED
FIRST-CLASS MAIL
U.S. POSTAGE
PAID
SACRAMENTO, CA
PERMIT NO. 1827

**SECURED DOCUMENT**                                    **2017**
WARNING: $2,000 FINE, 5 YEARS IMPRISONMENT, OR BOTH FOR ANY PERSON INTERFERING OR OBSTRUCTION WITH DELIVERY OF
THIS LETTER U.S. MAIL TITLE. 18 SEC. 1720 U.S. CODE

152.    The letters identify the sender as "Student Loan Division" and include a "Department Phone" number.  It also includes an official-seeming "Warning: $2,000 fine, or 5 years imprisonment or both ..."  The solicitations also list an eligibility code and estimated federal student loan balances for the consumer. The net impression of these features of the

32

solicitation is that the letter is from a governmental agency or an entity affiliated with a governmental agency.

Student Loan Division
1133 Westchester Avenue S-223
White Plains, NY 10604 USA

Eligibility Code: 92339994
Estimated Federal Student Loan Balances: $67,000
http://studentloaninfo.net
Department Phone: (888) 597-9322
Office Hours: Monday - Friday 10:00am - 10:00pm EST

Dear ████,

Contact us immediately at (888) 597-9322. Expiration date: 11/29/17.

Government legislation has recently passed making you eligible for substantial Federal Student Loan Relief. Our records indicate that your current student loan balances exceed $67,000.

Your current estimated student loan balances may qualify you for:

✓ Lower Interest Rates
✓ Lower Monthly Payments
✓ Forgiveness Of Debt

✓ Stop Garnishments
✓ Adjust For Income And Family Size
✓ Bring Loans In Default to Good Standing

We work directly on your behalf with the U.S. Department of Education to identify applicable financial relief programs allowing your Federally Insured Student Loans to be flexible and easy to manage.

Now that you've been pre-approved for this limited eligibility program, you can feel comfortable speaking with one of our student loan specialists to determine your available relief options.

Call now (888) 597-9322 and provide your eligibility code so we can assist you: 92339994
Or, visit your personal website for details: http://████studentloaninfo.net

Please forward all correspondence to:

Approval Dept.

Student Loan Division
1133 Westchester Avenue S-223
White Plains, NY 10604 USA
(888) 597-9322

## SECURED DOCUMENT

 2017

WARNING: $2,000 FINE, 5 YEARS IMPRISONMENT, OR BOTHS OR ANY PERSON INTERFERING OR OBSTRUCTION WITH DELIVERY OF THIS LETTER U.S. MAIL TTL 18 SEC. 1703 U.S. CODE

**FINAL ELIGIBILITY NOTICE**

**PERSONAL & CONFIDENTIAL**

This is a private fee-based assistance service, not endorsed or associated with any government agency. Company provides review and preparation of documents to assist in obtaining benefits related to publicly backed student loans. Company does not lend money, broker loans or consolidate debt. Same services offered by company may be available directly to consumers from government on a do-it-yourself basis without fees. Not available in all states. Call for complete details. Student Loan information contained herein is modified, this information is public record.

153. The solicitations also falsely represent that the consumer has only a limited time to act. The letter begins, "Contact us immediately at 888 701-0060. Expiration date: [date]".

154. In fact, there is no expiration date and no immediate need to contact Student Loan Care.

155. The letter also falsely represents that the consumer has only recently become eligible for "substantial" student loan relief: "Government legislation has recently passed making you eligible for substantial Federal Student Loan Relief."

156. In fact, the programs that tie monthly repayment amounts to borrower income, which any borrower who can meet the financial hardship requirements is eligible for, began to be offered in 2009 (with new options introduced in 2013 and 2015). Additionally, PSLF was authorized in 2007.

157. The letter also states, "Now that you've been pre-approved for this limited eligibility program, you can feel comfortable speaking with one of our student loan specialists to determine your available relief options."

158. In fact, the federal programs for which Student Loan Care purports to help borrowers apply are not limited, the borrowers have not been "pre-approved" for the programs, and the "eligibility code" is a ruse. The individuals who answer the phone calls are also not "student loan specialists."

159. Student Loan Care also ran a radio advertisement that referenced "recently passed" legislation and falsely touted Student Loan Care's "experienced specialist[s]" who would guide borrowers to "a solution that's right for you."

160. The ad did not reveal that Student Loan Care was selling fee-based services.

34

**C.** **Defendants' Further Deceptive Interactions with Borrowers**

161.    A number of the Contracting Defendants' ads contain phone numbers for borrowers to call to speak with a "Student Loan Counselor" or "student loan specialist."  In other instances, borrowers receive calls after they respond to direct mail, email or Internet advertising by providing contact information.  In still other instances, borrowers receive calls from one of the Marketing Defendants without knowing how the Defendants obtained their information.

162.    The Marketing Defendants and certain of the Contracting Defendants (Progress Advocates Group, Progress Advocates, and Student Loan Support) each use or used Student Loan Advisors to speak with borrowers, during which time the advisors made and/or currently make a variety of false and misleading claims.

163.    For example, Student Loan Advisors repeatedly tell borrowers that they are from the federal government, are a part of the federal student loan program, are working with the federal student loan program, or are working with a federal student loan servicer.

164.    In fact, the Contracting Defendants are not affiliated with the federal government or student loan servicers.

165.    The Student Loan Advisors repeatedly tell borrowers that they cannot enroll in the debt-relief services offered on their own, but, in fact, borrowers can work directly with their servicers or use the DOE website to obtain student loan debt-relief services at no additional cost.

166.    The Student Loan Advisors repeatedly tell borrowers that they can eliminate their student loan debt by making a number of payments to one of the Contracting Defendants.

167.    In fact, making payments to one of the Contracting Defendants will not reduce, let alone eliminate, their student loan debt.

168.    Student Loan Advisors have also encouraged consumers to take on additional debt, because with the assistance of their programs, the debt will be forgiven.

169.    In fact, Student Loan Advisors do not know whether the debt would in fact be forgiven.  For example, Progress Advocates contacted Kasey E. when she was about to finish her undergraduate degree.  The Student Loan Advisor from Progress Advocates suggested that Kasey E. take on additional federal student loan debt and attend graduate school, because the loans would be free.  Relying in large part on this representation, Kasey E. attended graduate school and took on an additional $60,000 in federal student loan debt, only to discover part-way through her program that her graduate school student loan debt was in fact not free.

170.    The Student Loan Advisors repeatedly tell borrowers that they will not be required to make any payment for the services offered by one of the Contracting Defendants until after that Defendant completes its services.

171.    However, Contracting Defendants have charged up-front fees in a variety of forms, including by requiring borrowers to enter into agreements with Equitable that obligate the borrower to make monthly payments that often continue months or several years before the Contracting Defendants complete their services.  Further, Student Loan Care currently requires borrowers to make an upfront payment to Equitable that is purportedly held in escrow by a third party, before the Defendants even begin to provide their services, let alone complete them.  And before the end of 2015, the Contracting Defendants took up-front payments directly from borrowers for their services.

172.    The Student Loan Advisors represent, directly and by implication, that only the Contracting Defendants are looking out for the borrowers' best interests, and that the borrowers' loan servicers intentionally do not tell borrowers about student loan debt consolidation and

income-based repayment programs so that they can make more money servicing the borrowers' loans.

173.    However, the Contracting Defendants charge large fees which borrowers can ill afford to pay and their repeated misrepresentations and usurious interest rates are not in the borrowers' best interests.

174.    The Student Loan Advisors repeatedly tell borrowers who ask about a Defendant with a poor BBB rating that the BBB is not set up to measure the standards of entities such as the Contracting Defendants and that they are instead held to the standards of the federal government. These statements are untrue.

175.    The Student Loan Advisors further tell borrowers that the Contracting Defendants are heavily regulated by a trade group to which they belong.

176.    In fact, the trade group does not regulate its members.  Indeed, some of the Contracting Defendants are not even members of the trade group.

177.    When trying to sell contracts for Student Loan Care, Student Loan Advisors repeatedly tell borrowers that Student Loan Care's parent company, Defendant Debt Resolve, is "registered on the New York Stock Exchange," which creates the misleading impression that consumers are dealing with a well-capitalized company.

178.    In fact, Debt Resolve is a speculative penny stock that does not, and never did, trade on one of the major exchanges and has never been registered on the New York Stock Exchange.

179.    The Student Loan Advisors repeatedly make a number of false and misleading statements concerning financing, including but not limited to telling borrowers that no interest

37

will be charged on the financing of the $1,314 fee; that the financing arrangement "abide[s] by" "federal regulations and standards"; and that borrowers are receiving a price break by financing.

180.    In fact, interest is routinely charged, borrowers are strongly steered towards and/or required to obtain financing with Equitable, the financing arrangement does not comply with federal regulations and standards, and borrowers do not receive a price break.

181.    The Student Loan Advisors also never tell borrowers the interest rate that they will be charged.  Equitable and/or its Contracting Defendant Partners charge 20.99% to nearly all New York consumers, and 17.99% to the rest, in violation of New York's 16% civil usury limit.

182.    As a result of the misrepresentations made by the Student Loan Advisors, borrowers are misled into entering into the agreements and paying $1,314 or more for services they could obtain for free.

183.    The Contracting and Marketing Defendants also do not clearly explain to consumers the nature of the financing contract.  After speaking with Student Loan Advisors, many consumers are left with the false impression that monthly payments made pursuant to the contract with Equitable are going toward paying down their student loan debt, when in fact, monthly payments to Equitable are just paying down the Contracting Defendant's fees.

184.    Based on Defendants' misrepresentations that borrowers' monthly payments are paying their student loans, some borrowers stop making payments on their loans.  It is only upon receiving communications from their federal loan servicers that they first realize that their substantial payments to the Defendants are not being applied to pay down their student loans.

185.    These borrowers suffer significant financial harm because they ultimately owe more on their student loans because they stopped making payments on their student loans for a period of time, during which time interest continued to accrue.

38

186.     Progress Advocates and Progress Advocates Group also told some borrowers that they qualified for PSLF when it was too early to know whether that was the case.  PSLF provides that borrowers who make 120 payments while working for qualifying public-service employers (including the military) may receive forgiveness of the remaining balance at the end of the period.  Because the program went into effect in October 2007, borrowers could not qualify for forgiveness before October 2017.

187.     In some cases, some Defendants told borrowers that they should consolidate their loans, but failed to tell those consumers that by doing so all of the payments that they had already made on the original loans would no longer count toward the 120 consecutive qualifying payments needed for loan forgiveness under PSLF.

188.     For example, Ryan D., a member of the United States Army stationed in Fort Drum, New York, was advised by a Student Loan Advisor at Student Advocates on behalf of Progress Advocates to consolidate his Direct Loans, without being informed that the consolidation would erase any qualifying payments he had previously made on his federal Direct Loans toward PSLF.  In fact Ryan D. had made more than a year's worth of qualifying payments at the time he signed a contract with Progress Advocates, as members of the armed forces are employed by a public service employer for purpose of the PSLF.  Relying on Student Advocates' advice, Mr. D. consolidated his loans, resulting in his loss of more than a year of qualifying PSLF loan payments.

189.     Some consumers were aware that consolidating some of their loans would erase any qualifying payments they had previously made on federal Direct Loans toward PSLF, and specifically requested that certain loans not be consolidated.  For example, Timber R. requested that Progress Advocates not consolidate certain of her loans, but Progress Advocates

consolidated those loans anyway, resulting in her loss of several years of qualifying PSLF loan payments.

190.    Some borrowers sought refunds and/or the termination of automatic withdrawals from their accounts by one of the Contracting Defendants or Equitable once they became aware that Defendants had misrepresented their services or had failed to handle annual recertification of income necessary to maintain eligibility for certain IBR programs.

191.    Defendants routinely denied these requests.

192.    Equitable and/or its Contracting Defendant Partners also mislead consumers by styling the financing offer as open-end credit, which the contract calls a "Revolving Credit Plan," when in fact, the financing arrangement is closed-end credit.  In other words, Equitable and/or its Contracting Defendant Partners are offering "spurious open-end credit."

193.    TILA defines "open-end credit" as a plan where "the creditor reasonably contemplates repeated transactions. . . and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602(j); *see also* 12 C.F.R. § 1026.2(20).  In other words, "open-end credit" transactions allow a consumer to repeatedly withdraw the loan amount upon its repayment, until the arrangement expires, such as with a credit line or credit card.

194.    But when consumers sign the Credit Plan contract, to the extent they understand that they are not paying down their student loan balance, they believe they are paying a one-time fee for debt-relief services.  They have no expectation that they will be able to make subsequent purchases from Equitable's Contracting Defendant Partners on this so-called "Revolving Credit Plan."  Thus, calling the loan a "revolving credit plan" is misleading because consumers have no

understanding or expectation that they are going to be able make new purchases on credit once they have paid down their balance.

195.    In fact, upon information and belief, no consumer has used the Revolving Credit Plan to make additional purchases from Equitable's Contracting Defendant Partners.

196.    In addition, the Credit Plan contracts fail to make disclosures required under TILA, whether the financing offers closed-end or open-end credit.

## IV.    **Other Fraudulent, Deceptive and Illegal Practices**

197.    As alleged above at paragraphs 97 - 105, the Contracting and Marketing Defendants are subject to federal and New York credit repair laws and violate those laws through collecting upfront fees and failing to make required disclosures.  These laws also prohibit "deceptive acts" which includes misrepresenting the "qualifications, training or experience of its personnel" and "the ability to improve a consumer's credit report or credit rating." GBL § 458-h; 15 U.S.C. § 1679b(a)(3)-(4).  Numerous deceptive actions of the Contracting and Marketing Defendants violate these provisions, including holding out Student Loan Advisors as experts.

198.    Both federal and New York laws also specifically protect consumers from deceptive and abusive telemarketing campaigns. *See* TSR, 16 C.F.R § 310, *et seq*. and New York GBL § 399-pp., *et seq*.  As alleged above at paragraphs 143 - 196, the Contracting and Marketing Defendants have engaged in repeated deceptive and abusive telemarketing campaigns.

199.    Further, the Marketing and Contracting Defendants, as telemarketers engaged in telemarketing in New York, are required to be registered with the New York Secretary of State and post a bond, irrevocable letter of credit or certificate of deposit with the Secretary of State. GBL §§ 399-pp(3) and -pp(4).  None of the Marketing or Contracting Defendants ever did so.

41

Therefore, the Marketing and Contracting Defendants have violated and are continuing to violate GBL §§ 399-pp(3) and -pp(4).

200.    Federal law subjects a holder of a consumer credit contract to any claims and defenses that could be asserted against the seller. The Credit Plan includes this statutorily-required language.

201.    Nonetheless, Equitable repeatedly tells borrowers who complain that they were misled by co-Defendants that the debts are valid and/or that the misconduct of those Defendants has no bearing on the borrowers' obligations to make payments to Equitable.  Such conduct is deceptive and misleading.

## V.    The Individual Defendants have Actual Knowledge of and/or Participate in the Fraudulent, Illegal and Deceptive Acts

202.    Defendant Bruce Bellmare is the current CEO of Debt Resolve and, along with another individual, oversees the management and financial affairs of Student Loan Care.  Debt Resolve and Student Loan Care are small companies with only a handful of employees. Defendant Bellmare was the Chief Operating Officer and a member of the Board of Directors of Debt Resolve before becoming its CEO in May 2016.

203.    Upon becoming the CEO, Bellmare reviewed the operations of Debt Resolve's majority-owned Progress Advocates and Student Loan Care and the representations that its Student Loan Advisors were instructed to make to borrowers.  Moreover, he determined that Debt Resolve should continue in its joint venture Student Loan Care with Defendant Hutton Ventures and continue to enter into Equitable Credit Plans with borrowers that it would then sell to Equitable.

204.    Bellmare is the public face of the company, as demonstrated in press releases that evidence his knowledge of the business operations of several co-Defendants.  In a Debt Resolve

42

press release dated May 15, 2017, Bellmare stated, "We are excited by the continued performance of our majority owned joint venture, Student Loan Care, LLC," and "in addition to the substantial increase in revenue, this represents the third consecutive quarter of operation income at Student Loan Care." In a Debt Resolve press release dated April 16, 2017, Bellmare stated, "After a year of operations in 2015, we realized the business model for Progress Advocates was flawed and our partners, operators of Progress Advocates, were unwilling to change. Our new partners, Hutton Ventures LLC, share our vision for developing a profitable growth business in this space. Our 2016 second half performance of accelerating growth in revenue and operating income, is a testament to our new business model for this industry and our future."

205.    As CEO of Student Loan Care, Bellmare has responded to individual borrower complaints forwarded to him by the CFPB or State Attorneys General concerning deceptive practices by Student Loan Care. The responses show personal knowledge of Student Loan Care's and Equitable's business practices.

206.    As such, Defendant Bellmare, has personal knowledge, or is in reckless disregard, of the misrepresentations by the Student Loan Advisors to borrowers and that the Equitable Credit Plans with New York borrowers were at usurious interest rates.

207.    Defendant Stanley E. Freimuth was the CEO of Debt Resolve and Progress Advocates, was on the Board of Managers of Progress Advocates from March 1, 2014 through May 16, 2016 and continues to act as a consultant to Debt Resolve. As the CEO of Progress Advocates, he oversaw the executive management and financial affairs of the partnership. As the CEO of Progress Advocates, he oversaw its executive management and financial affairs. Debt Resolve and Progress Advocates are small companies with only a handful of employees.

43

208.    Freimuth has publicly acknowledged on behalf of the Debt Resolve that he and Bellmare worked "side by side." In a Debt Resolve press release, dated April 25, 2016, Freimuth stated, "We are fortunate to be able to make a smooth transition to Bruce [Bellmare] who is highly qualified to assume this new role and has worked side by side with me during the Company's successful transition to its new growth strategy."

209.    Freimuth also personally signed a Master Dealer Agreement with Equitable as the CEO of Progress Advocates, which set the terms for Equitable's purchases of the Equitable Credit Plans that Progress Advocates entered into with New York and other borrowers, at interest rates that are usurious under New York laws.

210.    As such, Defendant Freimuth has personal knowledge, or is in reckless disregard, of the misrepresentations that were and are being made by the Student Loan Advisors to borrowers and that Equitable Credit Plans with New York borrowers were at usurious interest rates.

### FIRST CAUSE OF ACTION
### VIOLATION OF EXECUTIVE LAW § 63(12)
### FRAUD
### (as to all Defendants)

211.    The NYAG repeats and re-alleges paragraphs 1- 210 as if fully set forth herein.

212.    Executive Law § 63(12) authorizes the NYAG to bring an action when any person or entity engages in repeated fraudulent acts in the operation of a business.

213.    Executive Law § 63(12) broadly defines fraud to include "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

214.    Defendants have engaged in repeated fraudulent acts and practices in the marketing, sale and financing of debt-relief services, including but not limited to:

44

a.   Misrepresenting the nature of the services provided;

b.   Misrepresenting that Student Loan Advisors are "experts" who are "professional, experienced and highly trained";

c.   Misrepresenting that they are from a government agency or an entity affiliated with a government agency or working with a federal student loan servicer;

d.   Misrepresenting that borrowers have been pre-approved for certain federal loan programs and that there is a limited time period in which to act;

e.   Misrepresenting that borrowers cannot enroll in debt-relief services on their own;

f.   Misrepresenting that borrowers payments to one of the Contracting Defendants would be credited towards the borrower's federal student loan balance;

g.   Misrepresenting that they do not charge advance fees; and

h.   Misrepresenting the nature of the financing offered, including telling borrowers no interest will be charged, failing to disclose the interest rate, and presenting the arrangement as an open-end credit arrangement.

215.   In addition to its own fraudulent conduct, Equitable is also liable for the fraudulent conduct of the other Defendants because it is the holder of the consumers' credit contracts.

216.   The Defendants' credit contracts expressly provide that any holder of the contract is an assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

217.    Equitable also aids and abets the other co-Defendants.  By financing and purchasing the contracts between borrowers and the other Defendants, it provides substantial assistance in furtherance of the fraudulent and deceptive scheme.

218.    Moreover, Equitable is aware of its co-Defendants' deceptive and fraudulent activities because it has received many dozens of complaints from the BBB, the CFPB, and other sources, describing the fraudulent and deceptive business practices at issue.

219.    By holding the consumer credit contracts, Equitable is also a necessary party for complete relief.

220.    By reason of the conduct alleged above, all Defendants have engaged in repeated and persistent fraudulent conduct in violation of Executive Law § 63(12).

<u>SECOND CAUSE OF ACTION</u>
**PURSUANT TO EXECUTIVE LAW § 63(12)**
**VIOLATION OF GBL § 349**
**(as to all Defendants)**

221.    The NYAG repeats and re-alleges paragraphs 1- 210 as if fully set forth herein.

222.    Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of business.

223.    GBL § 349 prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the state of New York.

224.    Defendants have engaged in repeated and persistent deceptive acts and practices in the marketing, sale and financing of their debt-relief services, including but not limited to:

    a.   Misrepresenting the nature of the services provided;

    b.   Misrepresenting that Student Loan Advisors are "experts" who are
       "professional, experienced and highly trained";

46

     c.  Misrepresenting that they are from a government agency or an entity affiliated

        with a government agency or working with a federal student loan servicer;

     d.  Misrepresenting that borrowers have been pre-approved for certain federal loan

        programs and that there is a limited time period in which to act;

     e.  Misrepresenting that borrowers cannot enroll in debt-relief services on their

        own;

     f.  Misrepresenting that borrowers' payments to one of the Contracting

        Defendants would be credited towards the borrower's federal student loan

        balance;

     g.  Misrepresenting that they do not charge advance fees; and

     h.  Misrepresenting the nature of the financing offered, including telling borrowers

        no interest will be charged, failing to disclose the interest rate, and presenting

        the arrangement as an open-end credit arrangement.

225.    In addition to its own fraudulent conduct, Equitable is also liable for the fraudulent conduct of the other Defendants because it is the holder of the consumers' credit contracts.

226.    The Defendants' credit contracts expressly provide that any holder of the contract is an assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

227.    Equitable also aids and abets the other co-Defendants.  By financing and purchasing the contracts between borrowers and the other Defendants, it provides substantial assistance in furtherance of the fraudulent and deceptive scheme.

228.    Moreover, Equitable is aware of its co-Defendants' deceptive and fraudulent

activities because it has received many dozens of complaints from the BBB, the CFPB, and other

sources, describing the fraudulent and deceptive business practices at issue.

229.    By holding the consumer credit contracts, Equitable is also a necessary party for

complete relief.

230.    By their actions in violation of GBL § 349, Defendants have engaged in repeated

and persistent illegal conduct in violation of Executive Law § 63(12).

**THIRD CAUSE OF ACTION**
**PURSUANT TO GBL § 349(b)**
**VIOLATION OF GBL § 349**
**(as to all Defendants)**

231.    The NYAG repeats and re-alleges paragraphs 1- 210 as if fully set forth herein.

232.    GBL § 349(b) authorizes the NYAG to bring an action to enjoin deceptive acts or

practices in the conduct of any business, trade, or commerce in the state of New York.

233.    GBL § 349 prohibits deceptive acts and practices in the conduct of any business,

trade, or commerce in the state of New York.

234.    Defendants have engaged in deceptive acts and practices in the marketing, sale

and financing of their debt-relief services, including but not limited to:

a.    Misrepresenting the nature of the services provided;

b.    Misrepresenting that Student Loan Advisors are "experts" who are

"professional, experienced and highly trained";

c.    Misrepresenting that they are from a government agency or an entity affiliated

with a government agency or working with a federal student loan servicer;

d.    Misrepresenting that borrowers have been pre-approved for certain federal loan

programs and that there is a limited time period in which to act;

48

    e.  Misrepresenting that borrowers cannot enroll in debt-relief services on their own;

    f.  Misrepresenting that borrowers' payments to one of the Contracting Defendants would be credited towards the borrower's federal student loan balance;

    g.  Misrepresenting that they do not charge advance fees; and

    h.  Misrepresenting the nature of the financing offered, including telling borrowers no interest will be charged, failing to disclose the interest rate, and presenting the arrangement as an open-end credit arrangement.

235.    In addition to its own fraudulent conduct, Equitable is also liable for the fraudulent conduct of the other Defendants because it is the holder of the consumers' credit contracts.

236.    The Defendants' credit contracts expressly provide that any holder of the contract is an assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

237.    Equitable also aids and abets the other co-Defendants. By financing and purchasing the contracts between borrowers and the other Defendants, it provides substantial assistance in furtherance of the fraudulent and deceptive scheme.

238.    Moreover, Equitable is aware of its co-Defendants' deceptive and fraudulent activities because it has received many dozens of complaints from the BBB, the CFPB, and other sources, describing the fraudulent and deceptive business practices at issue.

239.    By holding the consumer credit contracts, Equitable is also a necessary party for complete relief.

240.     By their actions, Defendants have violated GBL § 349.

**FOURTH CAUSE OF ACTION**
**PURSUANT TO EXECUTIVE LAW § 63(12)**
**VIOLATION OF GBL § 350**
**(as to all Defendants)**

241.     The NYAG repeats and re-alleges paragraphs 1- 210 as if fully set forth herein.

242.     Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of business.

243.     GBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce in the State of New York

244.     Defendants' acts and practices, described above, are in violation of GBL § 350.

245.     Equitable is responsible for and has participated in the unlawful actions of the other co-Defendants.  The Defendants' contracts that offer financing to consumers through Equitable provide that the holders of such credit contracts are assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

246.     Thus, to the extent Equitable holds such credit contracts, Equitable is liable for the other Defendants' repeated and persistent unlawful conduct in violation of Executive Law § 63(12).

247.     Equitable also aids and abets the other co-Defendants.  By financing and purchasing the contracts between borrowers and the other Defendants, it provides substantial assistance in furtherance of the fraudulent, deceptive, and unlawful scheme.

248.    Moreover, Equitable is aware of the co-Defendants' unlawful activities because it has received many dozens of complaints from the BBB, the CFPB, and other sources, describing the unlawful advertising practices at issue.

249.    By holding the consumer credit contracts, Equitable is also a necessary party for complete relief.

250.    By their actions in violation of GBL § 350, Defendants have engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## FIFTH CAUSE OF ACTION
### PURSUANT TO GBL § 350(d)
### VIOLATION OF GBL § 350
### (as to all Defendants)

251.    The NYAG repeats and re-alleges paragraphs 1- 210 as if fully set forth herein.

252.    GBL § 350(d) authorizes the NYAG to bring an action to recover civil penalties for violations of GBL § 350.

253.    GBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce in the state of New York.

254.    The Defendants' acts and practices, described above, are in violation of GBL § 350.

255.    Equitable is also responsible for and has participated in the actions of the other co-Defendants.  The Defendants' contracts that offer financing to consumers through Equitable provide that the holders of such credit contracts are assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

51

256.    Thus, to the extent Equitable holds such credit contracts, Equitable is liable for the other Defendants' unlawful advertising practices in violation of GBL § 350.

257.    Equitable also aids and abets the other co-Defendants.  By financing and purchasing the contracts between borrowers and the Defendants, it provides substantial assistance in furtherance of the unlawful scheme.

258.    Moreover, Equitable is aware of the co-Defendants' deceptive and fraudulent activities because it has received many dozens of complaints from the BBB, the CFPB, and other sources, describing the unlawful advertising practices at issue.

259.    By holding the consumer credit contracts, Equitable is also a necessary party for complete relief.

260.    Defendants' acts and practices, described above, are in violation of GBL § 350.

## SIXTH CAUSE OF ACTION
### PURSUANT TO EXECUTIVE LAW § 63(12)
### VIOLATION OF NEW YORK BANKING LAW § 14-a and NEW YORK GENERAL OBLIGATIONS LAW § 5-501
### (as to Defendants Equitable, the Contracting Defendants, Owner Defendants, and Individual Defendants)

261.    The NYAG repeats and re-alleges paragraphs 1- 210 as if fully set forth herein.

262.    Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of business.

263.    New York General Obligations Law § 5-501 makes it unlawful to collect interest on loans or forbearances that exceed the rate set forth in New York Banking Law § 14-a.

264.    Neither Equitable nor the Contracting Defendants are licensed lenders in New York.  Equitable is also not licensed as a sales finance company.

265.   New York Banking Law § 14-a provides that the maximum interest rate for loans or forbearances in an amount less than $250,000 is 16% for unlicensed lenders and unlicensed sales finance companies.

266.   Contracts issued by unlicensed lenders or sales finance companies that charge more than the maximum usury rate under New York General Obligations Law § 5-501 and Banking Law § 14-a are void.  *See* N.Y. Gen. Oblig. Law § 5-511.

267.   As alleged above, in the course of making loans to New York residents and/or acquiring credit agreements with New York residents, Equitable repeatedly charged and collected interest in the amount of 20.99% which exceeds 16%, in violation of New York's civil usury laws.  *See* N.Y. Gen. Oblig. Law § 5-501; Banking Law § 14-a.

268.   As alleged above, the Contracting Defendants entered into consumer loans or retail instalment obligations or agreements which provided for charging and collecting interest in the amount of 20.99%.  This exceeds 16%, in violation of New York's civil usury laws.  *See* N.Y. Gen. Oblig. Law § 5-501; Banking Law § 14-a.  By virtue of such conduct, Equitable and the Contracting Defendants have engaged in repeated and persistent illegal conduct in violation of New York Executive Law § 63(12).

## SEVENTH CAUSE OF ACTION
### PURSUANT TO EXECUTIVE LAW § 63(12)
### VIOLATION OF GBL ARTICLE 28-BB
#### (as to all Defendants)

269.   The NYAG repeats and re-alleges paragraphs 1 - 210 as if fully set forth herein.

270.   Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of business.

271.    GBL § 458-b(1) defines a "credit services business" as any person or business that "sells, provides, or performs, or represents that he can or will sell, provide or perform, a service for the express or implied purpose of improving a consumer's credit record . . . or providing advice or assistance to a consumer with regard to the consumer's credit record . . . in return for the payment of a fee."  GBL § 458-b(1).

272.    As set forth in paragraphs 98 - 102, each Contracting and Marketing Defendant is a "credit services business" as defined by GBL § 458-b.

273.    GBL § 458-g provides that any contract for credit repair services that does not comply with Article 28-BB shall be void and unenforceable.

274.    In violation of Article 28-BB and GBL § 458-e, Defendants have collected advance fees prior to the performance of credit repair services.

275.    Defendants have further violated Article 28-BB by failing to provide consumers with:

   a.   A written information statement containing the information set forth in GBL § 458-d prior to executing a contract for credit services, including a complete and detailed statement of the consumer's rights provided under the federal and state FCRAs relating to accessing, reviewing and correcting a consumer's credit report as required pursuant to GBL § 458-d;

   b.   A written contract containing "[a] complete . . . statement of the services to be performed and the results to be achieved by the credit services business . . . on behalf of the consumer, including a list of the adverse information appearing on the consumer's credit report that will be modified, a description of the precise nature of [the] modification, . . . the estimated date by which each modification

54

will occur"; and a statement that no advance fees may be collected under the law as required by GBL § 458-f(1)(a) and (b); and

    c.   A copy of the consumer's credit report annexed to the contract with the adverse entries to be challenged clearly marked as required by GBL § 458-f(1)(a).

276.    Defendants have also engaged in deceptive practices in violation of GBL § 458-h, including misrepresenting "the nature of the services to be [provided]; the time within which services will be performed; [and] the ability to improve a consumer's credit report or . . . rating."

277.    Equitable is responsible for and has participated in the actions of the other co-Defendants. The Defendants' contracts that offer financing to consumers through Equitable provide that the holders of such credit contracts are assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

278.    Thus, to the extent Equitable holds such credit contracts, Equitable is liable for the other Defendants' repeated and persistent unlawful conduct in violation of Executive Law § 63(12).

279.    Equitable also aids and abets the other co-Defendants. By financing and purchasing the contracts between borrowers and the other Defendants, it provides substantial assistance in furtherance of the unlawful and deceptive scheme.

280.    Moreover, Equitable is aware of the co-Defendants' deceptive and unlawful activities because it has received many dozens of complaints from the BBB, the CFPB, and other sources, describing the unlawful and deceptive business practices at issue.

281.    By holding the consumer credit contracts, Equitable is also a necessary party for complete relief.

282.    Consequently, each Defendant has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## EIGHTH CAUSE OF ACTION
### PURSUANT TO GBL § 458-j
### VIOLATION OF GBL ARTICLE 28-BB
### (as to all Defendants)

283.    The NYAG repeats and re-alleges paragraphs 1 - 210 as if fully set forth herein.

284.    GBL § 458-j authorizes the Attorney General to seek injunctive relief, restitution and penalties for violations of New York's credit repair statute.

285.    GBL § 458-b(1) defines a "credit services business" as any person or business that "sells, provides, or performs, or represents that he can or will sell, provide or perform, a service for the express or implied purpose of improving a consumer's credit record . . . or providing advice or assistance to a consumer with regard to the consumer's credit record . . . in return for the payment of a fee." GBL § 458-b(1).

286.    As set forth in paragraphs 98 - 102, each Contracting and Marketing Defendant is a "credit services business" as defined by GBL § 458-b.

287.    GBL § 458-g provides that any contract for credit repair services that does not comply with Article 28-BB shall be void and unenforceable.

288.    In violation of Article 28-BB, GBL § 458-e, Defendants have collected advance fees prior to the performance of credit repair services.

289.    Defendants have further violated Article 28-BB by failing to provide consumers with:

a.    A written information statement containing the information set forth in GBL § 458-d prior to executing a contract for credit services, including a complete and detailed statement of the consumer's rights provided under the federal and state

56

FCRAs relating to accessing, reviewing and correcting a consumer's credit report as required pursuant to GBL § 458-d;

   b.   A written contract containing "[a] complete . . . statement of the services to be performed and the results to be achieved by the credit services business . . . on behalf of the consumer, including a list of the adverse information appearing on the consumer's credit report that will be modified, a description of the precise nature of [the] modification, . . . the estimated date by which each modification will occur"; and a statement that no advance fees may be collected under the law as required by GBL § 458-f(1)(a) and (b); and

   c.   A copy of the consumer's credit report annexed to the contract with the adverse entries to be challenged clearly marked as required by GBL § 458-f(1)(a);

290.   Defendants have also engaged in deceptive practices in violation of GBL § 458-h, including misrepresenting "the nature of the services to be [provided]; the time within which services will be performed; [and] the ability to improve a consumer's credit report or . . . rating."

291.   Equitable is responsible for and has participated in the actions of the other co-Defendants. The Defendants' contracts that offer financing to consumers through Equitable provide that the holders of such credit contracts are assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

292.   Thus, to the extent Equitable holds such credit contracts, Equitable is liable for the Defendants' unlawful and deceptive scheme.

293.    Equitable also aids and abets the other co-Defendants.  By financing and purchasing the contracts between borrowers and the other Defendants, it provides substantial assistance in furtherance of the unlawful and deceptive scheme.

294.    Moreover, Equitable is aware of the co-Defendants' deceptive and fraudulent activities because it has received many dozens of complaints from the BBB, the CFPB, and other sources, describing the unlawful and deceptive business practices at issue.

295.    By holding the consumer credit contracts, Equitable is also a necessary party for complete relief.

296.    Consequently, each Defendant has violated Article 28-BB, GBL § 458 *et seq.*

### NINTH CAUSE OF ACTION
**PURSUANT TO EXECUTIVE LAW § 63(12)**
**VIOLATION OF CROA, 15 U.S.C. § 1679 *et seq.***
**(as to all Defendants)**

297.    The NYAG repeats and re-alleges paragraphs 1 - 210 as if fully set forth herein.

298.    Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of business.

299.    Under 15 U.S.C. § 1679, a "credit repair organization" means "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i) . . . ." 15 U.S.C. § 1679a(3).

58

300.     As set forth in paragraphs 98 - 102, each of the Contracting and Marketing Defendants is a "credit repair organization" as defined by 15 U.S.C. § 1679a(3).

301.     15 U.S.C. § 1679f(c) provides that any contract for credit repair services that does not comply with CROA shall be void and unenforceable.

302.     Defendants have repeatedly violated CROA § 1679b by: (a) making statements or "misleading representations of the services of the credit repair organization"; (b) engaging in acts or practices or course of business "that constitutes or results in the commission of . . . fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization"; and (c) charging and receiving advance fees for credit repair services.

303.     Defendants have further repeatedly violated CROA §§ 1679c, 1679d and 1679e by failing to provide consumers with:

    a.   A written disclosure statement containing the information set forth in CROA § 1679c, prior to executing a contract for credit services, including a complete and detailed statement of the consumer's rights provided under state and federal law relating to accessing, reviewing and correcting a consumer's credit report and the consumer's rights under CROA;

    b.   A written contract pursuant to CROA § 1679d containing (i) "the terms and conditions of payment, including the total amount of all payments to be made by the consumer to the credit repair organization," (ii) a complete statement of "the services to be performed by the credit repair organization for the consumer, including all guarantees of performance, and an estimate of the date by which the performance of the services . . . will be complete or the length of the period necessary to perform such services," and (iii) "a conspicuous

59

statement . . . in immediate proximity to the space reserved for the consumer's signature on the contract, which [states]: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right'"; and

c. A Notice of Cancellation form, pursuant to CROA § 1679e, which must accompany each contract, in duplicate, providing for a three-day right of cancellation without penalty to the consumer.

304. Equitable is responsible for and has participated in the actions of the other co-Defendants. The Defendants' contracts that offer financing through Equitable provide that the holders of such credit contracts are assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

305. Thus, to the extent Equitable holds such credit contracts, Equitable is liable for the Defendants' repeated and persistent unlawful conduct in violation of Executive Law § 63(12).

306. Equitable also aids and abets the other co-Defendants. By financing and purchasing the contracts between borrowers and the other Defendants, it provides substantial assistance in furtherance of the unlawful scheme.

307. Moreover, Equitable is aware of the co-Defendants' deceptive and fraudulent activities because it has received many dozens of complaints from the BBB, the CFPB, and other sources, describing the unlawful and deceptive business practices at issue.

308. By holding the consumer credit contracts, Equitable is also a necessary party for complete relief.

309.    By reason of the foregoing, each Defendant has repeatedly violated 15 U.S.C. § 1679 *et seq.*

310.    Consequently, each Defendant has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

**TENTH CAUSE OF ACTION**
**PURSUANT TO 15 U.S.C. § 1679h(c)**
**VIOLATION OF CROA, 15 U.S.C. § 1679 *et seq.***
**(as to all Defendants)**

311.    The NYAG repeats and re-alleges paragraphs 1 - 210 as if fully set forth herein.

312.    15 U.S.C. § 1679h(c) authorizes the NYAG to seek injunctive relief, damages, costs and attorney fees for violations of CROA, 15 U.S.C § 1679 *et seq.*

313.    Under 15 U.S.C. § 1679, a "credit repair organization" means "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i) . . . ." 15 U.S.C. § 1679a(3).

314.    As set forth in paragraphs 98 - 102, each of the Marketing and Contracting Defendants is a "credit repair organization" as defined by 15 U.S.C. § 1679a(3).

315.    15 U.S.C. § 1679f(c) provides that any contract for credit repair services that does not comply with the Credit Repair Organizations Act ("CROA") shall be void and unenforceable.

316.    Defendants have repeatedly violated CROA § 1679b by: (a) making statements or "misleading representations of the services of the credit repair organization"; (b) engaging in acts

or practices or course of business "that constitutes or results in the commission of . . . fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization"; and (c) charging and receiving advance fees for credit repair services.

317.    Defendants have further repeatedly violated CROA §§ 1679c, 1679d and 1679e by failing to provide consumers with:

a.   A written disclosure statement containing the information set forth in CROA § 1679c, prior to executing a contract for credit services, including a complete and detailed statement of the consumer's rights provided under state and federal law relating to accessing, reviewing and correcting a consumer's credit report and the consumer's rights under CROA;

b.   A written contract pursuant to CROA § 1679d containing (i) "the terms and conditions of payment, including the total amount of all payments to be made by the consumer to the credit repair organization," (ii) a complete statement of "the services to be performed by the credit repair organization for the consumer, including all guarantees of performance, and an estimate of the date by which the performance of the services . . . will be complete or the length of the period necessary to perform such services," and (iii) "a conspicuous statement . . . in immediate proximity to the space reserved for the consumer's signature on the contract, which [states]: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract.  See the attached notice of cancellation form for an explanation of this right'"; and

c.   A Notice of Cancellation form, pursuant to CROA § 1679e, which must

accompany each contract, in duplicate, providing for a three-day right of cancellation without penalty to the consumer.

318.     Equitable is responsible for and has participated in the actions of the other co-Defendants.  The Defendants' contracts that offer financing to consumers through Equitable provide that the holders of such credit contracts are assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

319.     Thus, to the extent Equitable holds such credit contracts, Equitable is liable for the Defendants' unlawful conduct.

320.     Equitable also aids and abets the other co-Defendants.  By financing and purchasing the contracts between borrowers and the other Defendants, it provides substantial assistance in furtherance of the unlawful and deceptive scheme.

321.     Moreover, Equitable is aware of the co-Defendants' deceptive and unlawful activities because it has received many dozens of complaints from the BBB, the CFPB, and other sources, describing the deceptive and unlawful business practices at issue.

322.     By holding the consumer credit contracts, Equitable is also a necessary party for complete relief.

323.     By reason of the foregoing, each Defendant has repeatedly violated 15 U.S.C. § 1679 *et seq.*

### ELEVENTH CAUSE OF ACTION
### PURSUANT TO EXECUTIVE LAW § 63(12)
### VIOLATION OF THE TSR, 16 C.F.R. § 310 *et seq.*
### (as to all Defendants)

324.     The NYAG repeats and re-alleges paragraphs 1 - 210 as if fully set forth herein.

325.    Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of business.

326.    TSR 16 C.F.R. § 310.2(dd) defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods and services to the customer in exchange for consideration."

327.    TSR 16 C.F.R. § 310.2(ff) defines a "telemarketer" as any person who, in connection with telemarketing, initiates or receives telephone calls from a customer . . ."

328.    TSR 16 C.F.R. § 310.2(gg) defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services. . .  by use of one or more telephones and which involves more than one interstate telephone call."

329.    The Marketing and Contracting Defendants, are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined in the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

330.    The TSR, 16 C.F.R. § 310.2(o) defines "debt relief services" as "any program or service represented, directly or by implication, to renegotiate, settle or in any way alter the terms of payment or other terms of the debt. . ."

331.    The Marketing and Contracting Defendants are sellers or telemarketers of "debt relief services" as defined by the TSR, 16 C.F.R. § 310.2(o).

332.    The TSR, 16 C.F.R. § 310.4(a)(5), prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for any debt-relief service until and unless:

(A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; [and]

64

(B) The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor.

291.    The TSR, 16 C.F.R. § 310.3(a)(2)(x) prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services any material aspect of any debt-relief service.

292.    The TSR, 16 C.F.R. § 310.4(a)(2), prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for goods or services represented to improve a person's credit history, credit record, or credit rating until:

(i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and

(ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved.

293.    The TSR, 16 C.F.R. §§ 310.3 and 310.4 prohibit deceptive or abusive telemarketing acts or practices, including, but not limited to, misrepresenting, directly or by implication, in the sale of goods or services any material aspect of any debt-relief service.

294.    By reason of the conduct alleged above, Defendants have repeatedly violated the TSR, 16 C.F.R. § 310.

295.    Equitable is responsible for and has participated in the actions of the other co-Defendants.  The Defendants' contracts that offer financing to consumers through Equitable provide that the holders of such credit contracts are assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

296.     Thus, to the extent Equitable holds such credit contracts, Equitable is liable for the other Defendants' repeated and persistent unlawful conduct in violation of Executive Law § 63(12).

297.     Equitable also aids and abets the other co-Defendants.  By financing and purchasing the contracts between borrowers and the other Defendants, it provides substantial assistance in furtherance of the unlawful and deceptive scheme.

298.     Moreover, Equitable is aware of the co-Defendants' unlawful activities because it has received many dozens of complaints from the BBB, the CFPB, and other sources, describing the repeated and persistent unlawful and deceptive business practices at issue.

299.     By holding the consumer credit contracts, Equitable is also a necessary party for complete relief.

300.     Consequently, each Defendant has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## TWELFTH CAUSE OF ACTION
### PURSUANT TO 16 C.F.R. § 310.7
### VIOLATION OF THE TSR, 16 C.F.R. § 310 *et seq.*
### (as to all Defendants)

301.     The NYAG repeats and re-alleges paragraphs 1 - 210 as if fully set forth herein.

302.     16 C.F.R. § 310.7 authorizes state attorneys general to seek injunctive relief, damages, costs and attorney fees for violations of 15 U.S.C. § 1679 *et seq*.

303.     TSR 16 C.F.R. § 310.2(dd) defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods and services to the customer in exchange for consideration."

304.     TSR 16 C.F.R. § 310.2(ff) defines a "telemarketer" as any person who, in connection with telemarketing, initiates or receives telephone calls from a customer . . ."

305.    TSR 16 C.F.R. § 310.2(gg) defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services. . . by use of one or more telephones and which involves more than one interstate telephone call."

306.    The Contracting and Marketing Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined in the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

307.    The TSR, 16 C.F.R. § 310.2(o) defines "debt relief services" as "any program or service represented, directly or by implication, to renegotiate, settle or in any way alter the terms of payment or other terms of the debt. . ."

308.    The Contracting and Marketing Defendants are sellers or telemarketers of "debt relief services" as defined by the TSR, 16 C.F.R. § 310.2(o).

309.    The TSR 16 C.F.R. § 310.4(a)(2) prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for goods or services represented to improve a person's credit history, credit record, or credit rating until:

(i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and

(ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved.

310.    The TSR, 16. C.F.R. § 310.4(a)(5), prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for any debt-relief service until and unless:

(A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; [and]

(B) The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor.

311.    The TSR, 16 C.F.R. §§ 310.3 and 310.4 prohibit deceptive or abusive telemarketing acts or practices, including, but not limited to, misrepresenting, directly or by implication, in the sale of goods or services any material aspect of any debt-relief service.

312.    By reason of the conduct alleged above, Defendants have repeatedly violated the TSR, 16. C.F.R. § 310.

313.    Equitable is responsible for and has participated in the actions of the other co-Defendants. The Defendants' contracts that offer financing to consumers through Equitable provide that the holders of such credit contracts are assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

314.    Thus, to the extent Equitable holds such credit contracts, Equitable is liable for the Defendants' repeated and persistent unlawful and deceptive conduct.

315.    Equitable also aids and abets the other co-Defendants. By financing and purchasing the contracts between borrowers and the other Defendants, it provides substantial assistance in furtherance of the unlawful and deceptive scheme.

316.    Moreover, Equitable is aware of the co-Defendants' deceptive and unlawful activities because it has received many dozens of complaints from the BBB, the CFPB, and other sources, describing the unlawful and deceptive business practices at issue.

317.    By holding the consumer credit contracts, Equitable is also a necessary party for complete relief.

318.    Consequently, each Defendant has violated the TSR.

**THIRTEENTH CAUSE OF ACTION**
**PURSUANT TO EXECUTIVE LAW § 63(12)**
**VIOLATION OF GBL § 399-pp**
**(as to all Defendants)**

319.    The NYAG repeats and re-alleges paragraphs 1 - 210 as if fully set forth herein.

320.    Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of business.

321.    GBL 399-pp(2)(j) defines a "telemarketer" as "any person, who, for financial profit or commercial purposes in connection with telemarketing, either initiates, or initiates and receives telephone calls to or from a customer when the customer is in this state or any person who directly controls or supervises the conduct of a telemarketer."

322.    GBL 399-pp(2)(k) defines "telemarketing" as "any plan, program or campaign which is conducted to induce payment or the exchange of any other consideration for any goods or services by use of one or more telephones and which involves more than one telephone call by a telemarketer in which the customer is located within the state at the time of the call."

323.    The Contracting and Marketing Defendant are "telemarketer[s]" engaged in "telemarketing" as defined in GBL § 399-pp(2)(j) and (k).

324.    GBL § 399-pp(6)(a)(9) makes it unlawful for a telemarketer to directly or indirectly "request a fee in advance to remove adverse information or modify adverse information to improve a person's credit history or credit record."

325.    GBL § 399-pp(3) and (4) require telemarketers engaged in telemarketing in New York to obtain a certificate of registration from the New York Secretary of State, and to post a bond, letter of credit or certificate of deposit.

69

326.    Defendants have neither obtained such certificates of registration, nor posted bonds, letters of credit, or certificates of deposit.

327.    Because Defendants have failed to comply with the requirements of § 399-pp(3) and (4), they are prohibited pursuant to § 399-pp(3)(i) from enforcing or seeking any consideration for their services,

328.    Nevertheless, Defendants enforce and/or seek consideration for their services.

329.    By reason of the conduct alleged above, each Defendant has repeatedly violated GBL §§ 399(pp)(3) and (4).

330.    As alleged in paragraphs 1 - 210, Defendants give false or misleading information to New York consumers.  As such, Defendants violate GBL §§ 399-pp(6)(a)(3).

331.    Equitable is responsible for and has participated in the actions of the other co-Defendants.  The Defendants' contracts that offer financing through Equitable provide that the holders of such credit contracts are assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

332.    Thus, to the extent Equitable holds such credit contracts, Equitable is liable for the Defendants' repeated and persistent fraudulent conduct in violation of Executive Law § 63(12).

333.    Equitable also aids and abets the other co-Defendants.  By financing and purchasing the contracts between borrowers and the other Defendants, it provides substantial assistance in furtherance of the unlawful scheme.

334.    Moreover, Equitable is aware of the co-Defendants' unlawful and deceptive activities because it has received many dozens of complaints from the BBB, the CFPB, and other sources, describing the unlawful and deceptive business practices at issue.

335.    By holding the consumer credit contracts, Equitable is also a necessary party for complete relief.

336.    Consequently, each Defendant has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

### FOURTEENTH CAUSE OF ACTION
**PURSUANT TO GBL § 399-pp**
**VIOLATION OF GBL § 399-pp**
**(as to all Defendants)**

337.    The NYAG repeats and re-alleges paragraphs 1 - 210 as if fully set forth herein.

338.    GBL § 399-pp deems any violation of New York's telemarketing statute a deceptive act and practice subject to enforcement by the Attorney General as provided in GBL Article 22-A.

339.    GBL § 399-pp(2)(j) defines a "telemarketer" as "any person, who, for financial profit or commercial purposes in connection with telemarketing, either initiates, or initiates and receives telephone calls to or from a customer when the customer is in this state or any person who directly controls or supervises the conduct of a telemarketer."

340.    GBL § 399-pp(2)(k) defines "telemarketing" as "any plan, program or campaign which is conducted to induce payment or the exchange of any other consideration for any goods or services by use of one or more telephones and which involves more than one telephone call by a telemarketer in which the customer is located within the state at the time of the call."

341.    As set forth in paragraphs 107 - 112, the Contracting and Marketing Defendants are "telemarketer[s]" engaged in "telemarketing" as defined in GBL § 399-pp(2)(j) and (k).

342.    GBL § 399-pp(6)(a)(9) makes it unlawful for a telemarketer to directly or indirectly "request a fee in advance to remove adverse information or modify adverse information to improve a person's credit history or credit record."

343. GBL § 399-pp(3) and (4) require telemarketers engaged in telemarketing in New York to obtain a certificate of registration from the New York Secretary of State, and to post a bond, letter of credit or certificate of deposit.

344. Defendants have neither obtained such certificates of registration, nor posted bonds, letters of credit, or certificates of deposit.

345. Because Defendants have failed to comply with the requirements of § 399-pp(3) and (4), they are prohibited pursuant to § 399-pp(3)(i) from enforcing or seeking any consideration for their services,

346. Nevertheless, Defendants enforce and/or seek consideration for their services.

347. As alleged in paragraphs 1 - 210, Defendants give false or misleading information to New York consumers. As such, Defendants violate GBL §§ 399-pp(6)(a)(3).

348. Equitable is responsible for and has participated in the actions of the other co-Defendants. The Defendants' contracts that offer financing through Equitable provide that the holders of such credit contracts are assignees and/or subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the financing.

349. Thus, to the extent Equitable holds such credit contracts, Equitable is liable for the Defendants' violations of § 399-pp(3) and (4).

350. Equitable also aids and abets the other co-Defendants. By financing and purchasing the contracts between borrowers and the other Defendants, it provides substantial assistance in furtherance of the unlawful scheme.

351. Moreover, Equitable is aware of the co-Defendants' deceptive and unlawful activities because it has received many dozens of complaints from the BBB, the CFPB, and other sources, describing the deceptive and unlawful business practices at issue.

352.    By holding the consumer credit contracts, Equitable is also a necessary party for complete relief.

353.    By reason of the conduct alleged above, each Defendant has violated GBL §§ 399-pp(3) and (4) and as such are in violation of GBL § 349.

### FIFTEENTH CAUSE OF ACTION
### PURSUANT TO EXECUTIVE LAW § 63(12)
### VIOLATION OF TILA, 15 U.S.C. 1601 *et seq.*
#### (as to Equitable, or in the alternative, Equitable, Student Loan Care, Student Advocates Team, Progress Advocates, and Progress Advocates Group)

354.    The NYAG repeats and re-alleges paragraphs 1-210 as if fully set forth herein.

355.    Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of business.

356.    TILA sets forth rules governing the disclosure of terms, conditions, and fees applicable to consumer credit transactions.

357.    The contracts consumers have signed and continue to sign with Equitable and/or the Contracting Defendants constitute an extension of "credit" as that term is defined under TILA, because the contracts grant a right to the consumer to "incur debt and defer its payment." 15 U.S.C. § 1602(f). The contracts provide for payments of a fee for student loan debt-relief services on an installment basis.

358.    Equitable is either i) a "creditor," as defined by TILA, because it "regularly extends . . . consumer credit which is payable by agreement in more than four installments," and because the obligation is "initially payable on the face of the evidence of indebtedness" to Equitable. 15 U.S.C. § 1602(g) or ii) if not a creditor, it is an "assignee," as that term is

73

defined under 15 US.C. § 1641(a) that is liable for all of the below violations because they are apparent on the face of the disclosure statement.

359.    In the alternative, Equitable's Contracting Defendant Partners are "creditors," as defined by TILA, because they "regularly extend[s] . . . consumer credit which is payable by agreement in more than four installments," and because the obligation is "initially payable on the face of the evidence of indebtedness" to the Contracting Defendants.  15 U.S.C. § 1602(g).

360.    Despite being titled "Revolving Credit Plans," the contracts with consumers constitute closed-end credit transactions.  Closed-end transactions are anything other than open-end credit.  12 C.F.R. § 1026.2(a)(10).  "Open-end credit" is extended under a plan wherein "the creditor reasonably contemplates repeated transactions. . . and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance."  15 U.S.C. § 1602(j); *see also* 12 C.F.R. § 1026.2(20).

361.    These transactions are not open-end, because the creditor does not reasonably contemplate repeated transactions, and because the amount of credit extended to the consumer is not made available as the consumer repays an outstanding balance.  *See* 12 C.F.R. § 1026.2(20).

362.    TILA requires certain disclosures for closed-end credit that are not provided, including: (i) the "'amount financed', using that term," 15 U.S.C. § 1638(a)(2)(A); (ii) the "'finance charge' . . . using that term," 15 U.S.C. § 1638(a)(3); (iii) the "total of payments," which is the "sum of the amount financed and the finance charge," 15 U.S.C. § 1638(a)(5); and (iv) the number and amount of payments needed to repay the "total of payments," 15 U.S.C. § 1638(a)(6).

363.     Even assuming the transactions are open-end, they still lack disclosures in the form required for open-end transactions, including the grace period or time within which a consumer may repay any credit extended without a finance charge, which must be disclosed in a table format.  15 U.S.C. § 1637(a)(1); 12 C.F.R. § 1026.6(b)(1), (b)(2)(v).  Some contracts do not contain a complete statement of the consumer's billing error rights; and others contain no statement of those rights at all.  15 U.S.C. § 1637(a)(7); Appendix G-3(A) to 12 C.F.R. Part 1026.

364.     By reason of the conduct alleged above, Equitable and/or its Contracting Defendant Partners, have violated TILA.

365.     By its actions in violation of TILA, Equitable and/or its Contracting Defendant Partners, has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## SIXTEENTH CAUSE OF ACTION
### PURSUANT TO EXECUTIVE LAW § 63(12)
### VIOLATION OF BANKING LAW § 340
**(as to Equitable or in the alternative Student Loan Care, Student Advocates Team, Progress Advocates, and Progress Advocates Group)**

366.     The NYAG repeats and re-alleges paragraphs 1-210 as if fully set forth herein.

367.     Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of business.

368.     Article IX of the New York Banking Law regulates licensed lenders doing business in New York.  New York Banking Law § 340 prohibits any person or any other entity from making loans of $25,000 or less to an individual for personal, family, household or investment purposes without first obtaining a license from the superintendent of the Department

of Financial Services.  That section also states that a person or entity shall be considered as engaging in making loans in New York, subject to the licensing and other requirements of Article IX, if it solicits and makes loans to individuals then resident in New York.  The only exception is if the person or entity made only isolated, incidental or occasional transactions in New York.

369.    Equitable has made thousands of loans of less than $25,000 to individuals who resided in New York at the time the loans were solicited and made.

370.    In the alternative, Equitable's Contracting Defendant Partners have made thousands of loans of less than $25,000 to individuals who resided in New York at the time the loans were solicited and made.

371.    Neither Equitable nor its Contracting Defendant Partners have ever been licensed to solicit or make loans of $25,000 or less in New York.

372.    By reason of the conduct alleged above, Equitable, or in the alternative its Contracting Defendant Partners, have violated New York Banking Law § 340.

373.    By its actions in violation of Banking Law § 340, Equitable, or in the alternative its Contracting Defendant Partners, have engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## SEVENTEENTH CAUSE OF ACTION
## PURSUANT TO EXECUTIVE LAW § 63(12)
## VIOLATION OF BANKING LAW § 492
### (as to Equitable)

374.    The NYAG repeats and re-alleges paragraphs 1-210 as if fully set forth herein.

375.    Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of business.

376.    New York Banking Law § 491 defines a "sales finance company" as "a person engaged, in whole or in part, directly or indirectly, in the business of purchasing or otherwise acquiring retail instalment contracts, obligations or credit agreements made by and between other parties therein."

377.    Article XI-B of the New York Banking Law regulates sales finance companies doing business in New York.  Specifically, New York Banking Law § 492 provides that "[n]o person, except a bank, savings bank, savings and loan association, trust company, private banker, credit union, investment company organized under article twelve of this chapter and authorized to accept deposits, national bank, federal savings association, federal credit union, or out-of-state state bank, as such term is defined in subdivision two of section two hundred twenty-two of this chapter, or lender licensed pursuant to article nine of this chapter, shall engage in the business of a sales finance company in this state without a license . . ."

378.    To the extent that Equitable is purchasing or otherwise acquiring retail installment contracts, obligations or credit agreements made by borrowers with any of its Contracting Defendant Partners, Equitable is a sales finance company within the meaning of the New York Banking Law § 491.

379.    Equitable is not and never has been licensed to be a sales finance company in New York.

380.    By reason of the conduct alleged above, Equitable, is violating New York Banking Law § 492 by operating as a sales finance company in New York without a license.

77

381.     By its actions in violation of Banking Law § 492, Equitable has engaged in

repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## EIGHTEENTH CAUSE OF ACTION
## PURSUANT TO EXECUTIVE LAW § 63(12)
## VIOLATION OF PPL §§ 402 or 413
## (as to Equitable, Student Loan Care, Student Advocates Team, Progress Advocates, and Progress Advocates Group)

382.     The NYAG repeats and re-alleges paragraphs 1-210 as if fully set forth herein.

383.     Executive Law § 63(12) authorizes the NYAG to bring an action to enjoin

repeated illegal acts or persistent illegality in the carrying on, conducting, or transaction of

business.

384.     Article X of the New York PPL, the Retail Instalment Sales Act regulates retail

instalment contracts, obligations and credit agreements in New York.

385.     To the extent that the Credit Plan is a retail instalment obligation or credit

agreement covered by Article X of the PPL, it fails to comply with provisions required by PPL

§§ 402 or 413.

386.     In particular, it fails to include both at the top of the contract and directly above

the signature of the buyer, the words "RETAIL INSTALMENT OBLIGATION, in at least ten

point bold type, as required by PPL § 402.2(a).  It also fails to include the "notice to the buyer"

with the language required by PPL § 402(2)(b) and fails to include all disclosures required by

TILA, as alleged above in paragraphs 192-96, 354-65, and as required by PPL § 402(7)

387.     To the extent that the Credit Plan is a retail instalment credit agreement covered

by Article X of the PPL, it fails to include both at the top of the contract and directly above the

signature of the buyer, the words "RETAIL INSTALMENT CREDIT AGREEMENT, in at least

ten point bold type, as required by PPL § 413.2(c). It also fails to include the "notice to the

buyer" in at least eight point bold type with the language required by PPL § 413(2)(e) and all disclosures required by the federal Truth In Lending Act, as alleged above in paragraphs 192-96, 354-65, as required by PPL § 413.11(d).

388.    By reason of the conduct alleged above, Equitable and its Contracting Defendant Partners are violating PPL §§ 402 or 413.

389.    By their actions in violation of PPL §§ 402 or 413, Equitable and its Contracting Defendant Partners have engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests an order and judgment:

1.    Permanently enjoining Defendants from engaging in the fraudulent, deceptive, and illegal acts and practices alleged in the Complaint;

2.    Declaring that all agreements between Defendants and any borrower in violation of 15 U.S.C. § 1679f(c), GBL § 458-g, or Banking Law § 14-a and General Obligations Law §§ 5-501, 5-511 are null and void and unenforceable or, in the alternative, directing that Defendants refund the credit service charge under PPL § 401 *et seq.*;

3.    Directing Defendants to rescind all agreements between Defendants and any borrower;

4.    Directing Defendants to render an accounting to the NYAG of the name and address of each former and current customer of Defendants, and the amount of money received from each such former and current customer;

5.    Directing Defendants to make full monetary restitution and pay damages to all injured persons or entities;

79

6.      Directing Defendants to produce an accounting of profits and to disgorge all profits resulting from the fraudulent and illegal practices alleged herein;

7.      Directing Defendants to pay a civil penalty to the State of New York of up to $5,000.00 for each violation of GBL Article 22-A, pursuant to GBL § 350-d;

8.      Directing Defendants to pay a civil penalty to the State of New York of up to $2,000.00 for each violation of GBL § 399, pursuant to GBL § 399-pp(11)(b);

9.      Directing Defendants to pay a civil penalty to the State of New York of up to $1,000.00 for each violation of GBL § 458, pursuant to GBL § 458-j;

10.     Awarding Plaintiff additional costs of $2,000.00 against each Defendant pursuant to CPLR § 8303(a)(6); and

11.     Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
      December 12, 2018

                              Respectfully submitted,

                              BARBARA D. UNDERWOOD
                              Attorney General of the State of New York
                              Attorney for Petitioner

By:                  _____
                              MELVIN L. GOLDBERG
                              Assistant Attorney General
                              Bureau of Consumer Frauds and Protection
                              28 Liberty Street
                              New York, NY  10005
                              (212) 416-8296

Of Counsel:

JANE M. AZIA
Bureau Chief
Bureau of Consumer Frauds and Protection

LAURA J. LEVINE
Deputy Bureau Chief
Bureau of Consumer Frauds and Protection

STEWART DEARING
Assistant Attorney General
Bureau of Consumer Frauds and Protection