USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JUL 0 3 2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

The People of the State of New York,

Plaintiff,

—v—

Debt Resolve, Inc., et al.,

Defendants.

18-cv-9812 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

The Attorney General of the State of New York brings this civil enforcement action on behalf of the People of the State of New York ("Plaintiff") against ten entities and two individuals (collectively, "Defendants") who are involved in an allegedly fraudulent and deceptive scheme targeted at consumers with student loan debt. According to Plaintiff, Defendants' actions in marketing, selling, and financing programs that purportedly provide debt relief services violate numerous provisions of state and federal consumer protection law. Ten of the twelve Defendants[1] have moved to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, Defendants' motions to dismiss are DENIED.

I.  **FACTUAL BACKGROUND**

The Court takes the following facts, which are assumed to be true for the purposes of this motion, from the operative complaint in this action. *See, e.g., LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

---

[1] As of the date of this Order, Defendants Hutton Ventures, LLC and Student Advocates, LLC have failed to appear. The Clerk of the Court entered certificates of default against them on May 6, 2019. Dkt. Nos. 100, 101.

1

Defendants are ten entities and two individuals who market, sell, and finance programs that "claim to help student loan borrowers struggling with debt reduce or eliminate their federal student loan debt." Dkt. No. 41 ¶ 4. According to the Complaint, these programs are offered for free from the federal government, but Defendants charge hundreds of dollars in fees in exchange for enrollment in the programs. *Id.* ¶ 6. The Complaint alleges that, in order to induce consumers to purchase these services, Defendants make numerous misrepresentations, including claims that "borrowers cannot apply on their own" for the services, that Defendants are "loan experts," and/or are affiliated with the federal government, and "that the fees paid by borrowers will be applied to pay their student loan balances." *Id.* ¶¶ 5–6. In addition, the Complaint alleges, Defendants provide "incomplete and harmful advice" concerning available options, sometimes worsening borrowers' financial situations. *Id.* ¶ 6. When borrowers agree to purchase debt relief services from Defendants, they are required to pay a fee upfront. *Id.* ¶ 9. In some cases, borrowers are directed to enter into financing contracts with interest rates of as high as 21% in order to pay the fees. *Id.* ¶ 11. As alleged, these financing agreements "claim[] to provide open-ended credit," but in fact are closed-end credit plans. *Id.* ¶ 14. This conduct has been the subject of hundreds of consumer complaints to the Better Business Bureau ("BBB") and the Consumer Financial Protection Bureau ("CFPB"). *Id.* ¶¶ 47, 205.

In the Complaint, Plaintiff groups the Defendants by their roles in this allegedly fraudulent scheme. Debt Resolve, Inc. ("Debt Resolve") and Hutton Ventures, LLC ("Hutton Ventures") are categorized as "Owner Defendants." Debt Resolve is the majority owner of Defendants Progress Advocates, LLC ("Progress Advocates"), and Student Loan Care, LLC ("Student Loan Care"). Dkt. No. 41 ¶ 20. Hutton Ventures co-owns Defendant Student Loan Care. *Id.* Defendants Progress Advocates, LLC ("Progress Advocates"), Progress Advocates

2

Group, LLC ("Progress Advocates Group"), Student Loan Care, LLC ("Student Loan Care"), Student Loan Support LLC ("Student Loan Support"), and Student Advocates Team, LLC ("Student Advocates Team") are "Contracting Defendants," who enter into contracts with borrowers for student loan debt-relief services. *Id.* ¶¶ 24–29. The "Marketing Defendants," which include Student Advocates, LLC ("Student Advocates"), Student Advocates Group, LLC ("Student Advocates Group"), Student Advocates Team, and Student Loan advertise the debt-relief services to consumers on behalf of Contracting Defendants. *Id.* ¶¶ 30–35. The two "Individual Defendants," Bruce Bellmare ("Bellmare") and Stanley E. Freimuth ("Freimuth"), have occupied various leadership positions in Debt Resolve, Student Loan Care and Progress Advocates. *Id.* ¶¶ 49–51. Finally, Defendant Equitable Acceptance Corporation ("Equitable") is the "Financing Defendant." Equitable drafts the financing plan agreements that borrowers enter into to pay the fees charged by Contracting Defendants, and then purchases these agreements from Contracting Defendants. *Id.* ¶¶ 36–48.

Plaintiff further alleges that the Owner Defendants, Contracting Defendants, and Marketing Defendants, many of which share almost identical names, are interrelated companies. *See* Dkt. No. 41 ¶¶ 19–51. Notably, eight of the Defendants share a principle place of business with at least one other Defendant. Defendants Debt Resolve and Student Loan Care share a principle place of business. *Id.* ¶ 19. Student Advocates Team, Progress Advocates Group, Student Loan Support, Student Advocates Group, and Student Advocates all have the same principle place of business, which they share with Progress Advocates, whose majority owner is Debt Resolve. *Id.* In addition, with the exception of Student Loan Care, each Contracting Defendant and Marketing Defendant either provided or received marketing services from no fewer than three other Defendants. *Id.* ¶¶ 24–35.

The Complaint alleges that the Individual Defendants are personally involved with the management and day-to-day operations of several of the corporate Defendants. Defendant Bellmare, who is the CEO of Debt Resolve, is alleged to have "reviewed the operations of Debt Resolve's majority-owned Progress Advocates and Student Loan Care and the representations that its Student Loan Advisors were instructed to make to borrowers." Dkt. No. 41 ¶ 202. Bellmare also "determined that Debt Resolve should…continue to enter into Equitable Credit Plans with borrowers." *Id.* ¶ 203. In addition, Bellmare "responded to individual borrower complaints forwarded to him by the CFPB or State Attorneys General concerning deceptive practices by Student Loan Care." Defendant Freimuth is the former CEO of both Debt Resolve and Progress Advocates. *Id.* ¶ 50. Freimuth personally signed a Master Dealer Agreement with Equitable during his tenure as CEO of Progress Advocates. *Id.* ¶ 209. This agreement "set the terms for Equitable's purchases of the Equitable Credit Plans that Progress Advocates entered into with…borrowers." *Id.*

## II. PROCEDURAL BACKGROUND

Plaintiff filed this action in state court on September 20, 2018. *See* Dkt. No. 1. On October 24, 2018, Defendant Equitable removed the case to this Court with the consent of all Defendants. *Id.* Three groups of Defendants subsequently moved to dismiss, Dkt. Nos. 27, 34, 35, and Plaintiff filed an amended complaint on December 12, 2018, Dkt. No. 36. The operative complaint in this action is the Second Amended Complaint ("the Complaint"), which Plaintiff filed on December 24, 2018. Dkt. No. 41.

The Complaint contains 18 counts against a total of 12 Defendants—ten entities and two individuals. *See id.* Plaintiff alleges that Defendants were engaged in a deceptive scheme to sell debt-relief services to individuals with student loans in violation of New York Executive Law

4

("Exec. Law") § 63(12); New York General Business Law ("GBL") §§ 349–50; and the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679. In addition, Plaintiff alleges that Defendants used selling tactics that violate the Telemarketing Sales Rule, 16 C.F.R. § 310, and § 399 of the GBL, and enter into contracts with purchasers that violated New York Banking Law ("Banking Law") § 14-a; New York General Obligations Law ("GOL") § 5-501; GBL Art. 28-BB; and the Truth in Lending Act ("TILA"), 15 U.S.C. 1601 *et seq*. Finally, according to the Complaint, Defendants failed to secure certain New York state licenses, as required by Banking Law §§ 340, 492 and New York Personal Property Law ("PPL") §§ 402 or 413

On January 25, 2019, two groups of Defendants moved to dismiss the Complaint in full; one motion was filed by Debt Resolve, Inc., Bruce Bellmare, and Stanley E. Freimuth, Dkt. No. 57, and one motion was filed by Progress Advocates, LLC and Student Loan Care, LLC, Dkt. No. 60. On February 5, 2019, Defendant Equitable Acceptance Corp. filed a motion to dismiss. Dkt. No. 65. A fourth and final motion to dismiss was filed on March 8, 2019, by Defendants Progress Advocates Group, LLC, Student Advocates Group, LLC, Student Advocates Team, LLC, and Student Loan Support, LLC. Dkt. No. 80. All four motions to dismiss were fully briefed as of May 1, 2019, and the Court held oral argument on May 15, 2019.

### III. LEGAL STANDARD

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts the allegations in the Complaint as true and draws all reasonable inferences in favor of the non-moving party. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). To survive a motion to dismiss, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, "the complaint's factual allegations must be enough to raise a right to relief above the speculative level, i.e., enough to make the claim plausible." *Arista Records, LLC, v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555) (internal citations omitted). "Threadbare recital of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## IV. DISCUSSION

In their four motions, Defendants advance various overlapping arguments, which the Court will group for convenience and address together as appropriate.

### A. Pleading Standard

#### 1. Rule 9(b)

All four sets of Defendants assert that Plaintiff must plead the facts in the Complaint with particularity because the claims are based on allegations of fraudulent conduct. "Allegations of fraud are subject to a heightened pleading standard" pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *Nakahata v. New York-Presbyterian Healthcare System, Inc.*, 723 F.3d 192, 197 (2d Cir. 2013). For claims subject to Rule 9(b) pleading, Plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Nakahata*, 723 F.3d at 197 (quoting *Mills v. Polar Molecular Co.*, 12 F.3d 192, 197-98 (2d Cir. 2013). "In addition, the plaintiff must allege facts that give rise to a *strong* inference of

fraudulent intent." *Id.* at 198 (emphasis in original). According to Defendants, Plaintiff has not met this heightened standard, and therefore the Complaint must be dismissed.

The Court concludes that the heightened standard is not applicable. The Second Circuit has held that actions brought under statutory provisions, like GBL § 349, that do not require proof of the same elements as common law fraud are "not subject to the pleading-with-particularity requirements of Rule 9(b)." *Pelman ex el. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005). None of the claims asserted by Plaintiff require a showing of the elements of common law fraud. *See generally* Dkt. No. 71. As other courts have reasoned, Rule 9(b) by its terms applies only to "fraud or mistake," and therefore its application to claims brought under consumer protection statutes is inappropriate, even if those claims have a "deceptive dimension." *See, e.g., Consumer Financial Protection Bureau v. Navient Corp.*, 3:17-CV-101(RDM), 2017 WL 3380530 at *24 (M.D. Pa. Aug. 4, 2017).

Indeed, Defendants fail to cite any cases in which a court found the heightened standard for fraud to be required for claims that do not include intent or reliance as an element. *See Consumer Financial Protection Bureau v. RD Legal Funding, LLC*, 332 F.Supp.3d 729, 769 (S.D.N.Y. 2018) ("Applying the same logic that the Court of Appeals has employed in determining that claims under N.Y. GBL § 349 are not subject to Rule 9(b)'s heightened pleading standards where the underlying conduct is not premised on a fraudulent scheme, the Court concludes that NYAG's claim under N.Y. Executive Law § 63(12) is also not subject to this heightened pleading standard because the underlying conduct is premised on deceptive acts or practices *that do not include intent or reliance as an element of those claims*.") (emphasis added). Defendants have not argued that any claims brought by Plaintiff require a showing of

intent. Accordingly, the Court holds that the Complaint need only meet the Rule 8 pleading standard.

**2. Rule 8(a)**

Defendants argue in the alternative that the claims in the Complaint do not meet the more generous pleading standard outlined in Rule 8(a) because Plaintiff has failed to identify which specific Defendant committed each individual unlawful act. As a preliminary matter, this argument overlooks the extensive individualized allegations contained in the Complaint; though the scheme itself is complex and the relationships between the Defendants have changed over time, it is nevertheless discernible from the Complaint which specific role each Defendant is alleged to have played.

However, the Court also concludes that Plaintiff has adequately pled facts suggesting that Defendants (other than Equitable, whose specific liability is addressed below) operated as a common enterprise. Where multiple corporate entities operate a "common enterprise," each of the interrelated companies may be held liable for the actions of the other. *See, e.g., F.T.C. v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014). As a result, complaints alleging the liability of a common enterprise need not allege that each defendant committed a particular unlawful act. *See id.* (noting that there is "an exception" to the general rule that pleadings must specify which Defendant allegedly committed which act "where multiple corporate defendants operate a common enterprise") (internal quotation marks omitted). To determine whether a common enterprise exists, courts consider factors such as "whether they (1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *F.T.C. v. Consumer Health Benefits Ass'n (Consumer Health Benefits I)*, 10cv3551(ILG)(RLM), 2012 WL 1890242 at *5 (E.D.N.Y. May

23, 2012) (citing *F.T.C. v. Neovi, Inc.*, 598 F.Supp.2d 1104, 1116 (C.D. Cal. 2008)). No single factor is dispositive. *See id.* at *8; *see also Tax Club*, 994 F. Supp. 2d at 469. Of course, at the motion to dismiss stage, Plaintiff need only allege facts plausibly supporting the existence of a common enterprise, not prove that such an enterprise in fact exists.

Here, the Complaint alleges that the Owning, Marketing, and Contracting Defendants are inter-related entities that operate in conjunction to carry out a common scheme. Specifically, the Complaint alleges that each of the moving corporate Defendants (excluding Equitable) has shared one of two principle places of business, and others have conducted business at the same address; *see* Dkt. No. 41 ¶¶ 19-20; that the two individual Defendants were each involved managing at least two of the corporate Defendants, *see id.* ¶¶ 49-50; and that six of the corporate Defendants share personnel, *see id.* ¶ 69. Apart from Debt Resolve and Student Loan Care, each of the Marketing and Contracting Defendants is alleged to have either provided or received marketing services from at least three other entities within the scheme. *See id.* ¶¶ 24-35. This includes Progress Advocates, which, along with Student Loan Care, is majority owned by Debt Resolve, but shares a principle place of business with five other Marketing/Contracting Defendants. *See id.* Moreover, the Complaint alleges that the entities, which have confusingly similar names, followed "the same basic business model," and many have used nearly identical scripts or contract language. *Id.* ¶ 69. Critically, taking the allegations in the Complaint as true, this business model relied on the entities working together as a unit to carry out the deceptive scheme, performing various roles that have shifted between entities over time. *See generally* Dkt. No. 41. Considering the "pattern and frame-work of the whole enterprise," the Court concludes that the Complaint contains sufficient factual allegations suggesting the presence of the factors listed above, as well as additional indicia of relatedness, to plead common enterprise

9

liability. *Art National Mfrs. Dist. Co. v. Federal Trade Commission*, 298 F.2d 476, 477 (2d Cir. 1962).

Because the Court finds that Plaintiff has alleged that Defendants operated as a common enterprise, the arguments advanced by Moving Defendants that the Complaint did not sufficiently allege their involvement in various parts of the scheme are unavailing. *See Consumer Health Benefits*, No. 10 Civ. 3551(ILG)(RLM), 2011 WL 3652248, at *5 ("Corporate entities that operate in a common enterprise may be held liable for one another's deceptive acts and practices."). For instance, the argument that some Defendants cannot face liability under the Telemarketing Rule because it was the Marketing Defendants alone whom the Complaint alleges solicited sales by telephone is, in the common enterprise context, without merit.

In sum, the Court concludes that the Complaint pleads facts with sufficient specificity to survive a motion to dismiss.

### B. Liability Under Credit Repair Regulations

Some Moving Defendants argue that they cannot be held liable for violations of New York state and federal statutes that regulate "credit repair" or "credit services" businesses because the Complaint fails to allege that they meet the definition of such a business. *See* Dkt. No. 61 at 16–20; Dkt. No. 80-1 at 15–17. The Court finds this argument unconvincing. First, Defendants cite no authority for the proposition that credit repair services and debt relief services are mutually exclusive. A credit repair organization is defined under CROA as "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (*or represent that such person can or will sell, provide, or perform*) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice

or assistance to any consumer with regard to any activity or service described in clause (i)...." 15 U.S.C. 1679a(3) (emphasis added). The statutory definition of "credit services business" contained in GBL is, in relevant part, identical. *See* GBL § 458-b(1).

Plaintiff has alleged that Marketing Defendants informed borrowers during sales calls that the services provided would "lower the amount of trade lines you have on your credit report which would report as a positive on your credit." Dkt. No. 41 ¶ 102. Similarly, the Student Advocates website contained the following language: "Improve Your Credit – Many of the student loan borrowers we've worked with have seen dramatic improvements in their credit." *Id.* ¶ 102. At this stage of the litigation, these allegations are sufficient to suggest that Defendants represented that their services had the purpose, at least in part, of improving borrowers' credit scores, bringing Defendants within the purview of both CROA and the GBL regulations of credit services businesses. *See, e.g., Limpert v. Cambridge Credit Counseling Corp.*, 328 F. Supp. 2d 360, 365 (E.D.N.Y. 2004) (denying a motion to dismiss CROA claims where "drawing reasonable inferences in Plaintiffs' favor..., it may be proven that certain of Defendants represented that they would re-establish their clients' spotty credit reports").

The Court therefore declines to dismiss the claims for violations of CROA and GBL Art. 28-BB.

### C. Liability of the Non-Financing Defendants for Violations Related to Credit Plans

Certain of the Moving Defendants argue that they cannot be held liable for claims associated with flaws in the consumer credit plans described in the Complaint because it was Equitable alone who provided the loans in question. *See* Dkt. No. 61 at 15; 22-24; Dkt. No. 81 at

14-15; 19-21. However, this argument overlooks Plaintiff's factual allegations concerning the credit plans at issue.

According to the Complaint, Equitable, the Financing Defendant, entered into agreements with Progress Advocates, Progress Advocates Group, Student Advocates Team, and Student Loan Care, wherein Equitable "agrees to purchase borrowers' contracts from these entities by paying them the full amount of the contract as an upfront payment." Dkt. No. 41 ¶ 91. Thereafter, the borrowers' monthly payments are made to Equitable, rather than to the entities providing the debt relief services. However, the Court infers from these allegations that it is the Contracting Defendants who initially enter into the borrower contracts, even though those contracts are subsequently purchased by Equitable. *See id.*; *see also id.* ¶¶ 74-80 (describing the process by which Student Loan Advisors employed by the Marketing Defendants send borrowers the credit plan on behalf of Contracting Defendants). These contracts, referred to as credit plans, allegedly violate various statutory provisions because the interest rate charged is usurious, the contracts themselves do not contain necessary disclosures, and the Defendants are not licensed to issue loans. *See id.* ¶¶ 116-139. In addition to describing Equitable's role in accepting consumer payments, the Complaint alleges that prior to 2015, Defendants Progress Advocates, Progress Advocates Group, and Student Loan Support received payments directly from consumers. *See id.* ¶ 85.

On these facts, Plaintiff has pleaded causes of action against the common enterprise Defendants—i.e., the non-Financing Defendants—for these violations. With respect to the usury cause of action, New York law prohibits corporations and persons from "directly or indirectly...charg[ing], tak[ing], or receiv[ing]" money as interest in excess of the statutory maximum rate. N.Y. GOL § 5-501(2). This language is broad, and encompasses conduct other

than directly collecting the interest. Accepting the allegations in the Complaint as true and drawing all inferences in favor of Plaintiff, the right to relief under this provision against the non-Financing Defendants—who allegedly enter into contracts with borrowers for loans at usurious rates, even if another entity ultimately receives the interest payments—is more than speculative. Similarly, given that the non-Financing Defendants send the contracts to consumers and may be the entities that extend credit in the first instance, Plaintiff has sufficiently alleged that their conduct, in addition to Equitable's, runs afoul of the disclosure and licensing requirements of TILA and the New York PPL. Moreover, the allegations that certain non-Financing Defendants issued loans directly to borrowers prior to 2015 are independently sufficient to preclude dismissal of these claims in their entirety.

At this stage, where all inferences must be drawn in favor of the non-moving party, Plaintiff has sufficiently stated a claim that non-Financing Defendants can be held liable for the allegedly unlawful aspects of the credit plans.

### D. Liability of the Individual Defendants

In their motion to dismiss, filed jointly with Defendant Debt Resolve, Individual Defendants argue that Plaintiff did not allege facts supporting their personal participation in the illegal conduct described in the Complaint. *See* Dkt. No. 58 at 13–20. According to Individual Defendants, "[p]ersonal liability may be imposed on a corporate officer or owner only for misfeasance or malfeasance, i.e., at affirmative tortious act," and the Complaint alleges only conclusorily that Bellmare and Freimuth had personal knowledge, or were in reckless disregard, of the deceptive conduct described. *Id.* at 14 (internal quotation marks omitted).

The Court disagrees. As a preliminary matter, Individual Defendants misstate the standard for individual liability for the claims against them in this case. Under the New York

state statutes at issue here, "[o]fficers and directors of a corporation may be held liable for fraud if they participate in it or have actual knowledge of it." *People by Abrams v. Apple Health & Sports Clubs, Ltd., Inc.* 599 N.E.2d 683, 686 (N.Y. 1992). Similarly, to state a claim for individual liability under the TSR, Plaintiff must allege that the individual "(1) participated in the acts or had authority to control the corporate defendant and (2) knew of the acts or practices." *F.T.C. v. Medical Billers Network, Inc.*, 543 F.Supp.2d 283, 320 (S.D.N.Y. 2008).

The Complaint contains specific allegations that, if true, establish a likelihood that Bellmare and Freimuth were both aware of the deceptive scheme and directly participated in aspects of it, or, at the very least, had authority to control some of the entities involved in the common enterprise. As described above, Bellmare reviewed the operations of Defendants Progress Advocates and Student Loan Care and the representations the Student Loan Advisors were instructed to make to borrowers, personally determined that Debt Resolve should continue entering into Equitable Credit Plans with borrowers, and responded to individual borrower complaints. Freimuth oversaw the executive management of Progress Advocates and personally signed an agreement with Equitable setting the terms for Equitable's purchase of the credit plans. Moreover, both Bellmare and Freimuth served as CEO of Debt Resolve and participated in its day-to-day operations, which is evidence of authority to control the company. *See id.* ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer".) (quoting *F.T.C. v. Amy Travel Service, Inc.*, 875 F.2d 564, 573-74 (7th Cir. 1989)); *see also Consumer Sales Corp. v. FTC*, 198 F.2d 404, 407–08 (2d Cir. 1952).

The specific factual allegations against Bellmare and Freimuth, taken as true, are therefore sufficient to raise the right to relief above a speculative level, and their motion to dismiss the Complaint is denied.

### E. Liability of Equitable

Finally, Equitable argues that many of the claims against it must be dismissed, as Plaintiff cannot establish Equitable's vicarious liability for the alleged misrepresentations and statutory violations of the other Defendants under either of two theories advanced in the Complaint. Equitable contends that: (1) the so-called "Holder Rule," which preserves a consumer's right to assert available legal claims and defenses against the purchaser of a credit contract, does not create a cause of action, and (2) the statutory provisions at issue do not provide for aiding and abetting liability. *See* Dkt. No. 52-1 at 8-20. However, for purposes of deciding this motion, the Court need not reach the question of whether Equitable can be held vicariously liable under these theories because the Court concludes that Plaintiff has sufficiently pled Equitable's *direct* role in the fraudulent scheme.

In the Second Circuit, "a defendant may be held liable for engaging in deceptive practices and acts if, with knowledge of that deception, it either directly participates in a deceptive scheme or has the authority to control the deceptive content at issue." *F.T.C. v. LeadClick Media, LLC*, 838 F. 3d 158, 168 (2d Cir. 2016). Accordingly, even if Equitable did not itself create the deceptive content used by Marketing Defendants to lure borrowers to enter into the credit plans, Plaintiff can still establish liability for the deceptive scheme by showing that Equitable

"engage[d] in deceptive acts or practices that are injurious to customers with at least some knowledge of the deception." *Id.* at 169-70.

In this case, Plaintiff asserts that Equitable provided the financing to consumers to allow them to purchase debt relief services of dubious value peddled by the other Defendants, who affirmatively misrepresent various attributes of the services. The plans, moreover, allegedly lack required disclosures and require consumers to pay Equitable usurious interest rates. Equitable's alleged actions are thus directly injurious to the consumers who enter into the credit plans. *See* Dkt. No. 41 ¶¶ 6-12 (describing the harms suffered by borrowers who purchase debt relief services, many of whom financed the purchases through Equitable). In addition, the Complaint adequately alleges that Equitable was on notice of the fraudulent nature of the scheme. First, Equitable "received hundreds of complaints from the BBB, the CFPB, and other sources over the past several years, which describe in detail the illicit practices of Marketing and Contracting Defendants" alleged in the Complaint. *Id.* ¶ 47. Second, as alleged, Equitable's own payments to Contracting Defendants constituted illicit upfront payments. *See id.* ¶ 103. And third, the fact that Contracting Defendants charged over $1,000 for services allegedly available to the consumers for free, if proven, could constitute notice to Equitable that the transactions were induced by deception. *See State v. ITM, Inc.*, 52 Misc. 2d 39, 51-52 (Sup. Ct. N.Y. Cnty. 1996). This is enough, at this point in the proceedings, for Plaintiff's claims against Equitable to survive. *Cf. F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1157 (9th Cir. 2010) (holding a corporate defendant liable at the summary judgment stage based on a showing that it "engaged in a practice

that facilitated and provided substantial assistance to a multitude of deceptive schemes," despite having "reason to believe" that a fraud was occurring).

Accordingly, for these reasons and the reasons stated above, Equitable's motion to dismiss is denied.

## V. CONCLUSION

Having considered the arguments made in the four pending motions to dismiss, the Court DENIES these motions in full. A status conference is hereby scheduled for July 26, 2019, at 2:45 p.m. The parties shall meet and confer and submit a status update by no later than one week prior to the conference.

This resolves Dkt. Nos. 57, 60, 65, and 80.

SO ORDERED.

Dated: July 3, 2019
New York, New York

_____
ALISON J. NATHAN
United States District Judge